## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | : **Chapter 11** |
| | : |
| **CENTAUR PA LAND, LP, et al.,**[1] | : **Case No. 09-13760 (KJC)** |
| | : |
| **Debtors.** | : **(Jointly Administered)** |
| | : |

## DECLARATION OF KURT E. WILSON IN
## SUPPORT OF FIRST DAY MOTIONS

I, Kurt E. Wilson, hereby declare under penalty of perjury that, to the best of my

knowledge and belief, and after reasonable inquiry, the following is true and correct:

1. On October 28, 2009 (the "Original Petition Date"), Centaur PA Land,

L.P. and Valley View Downs, LP (together, the "First Filed Debtors"), each commenced a case

under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the

"Bankruptcy Code"), in this Court. This Court granted joint administration of the First Filed

Debtors' chapter 11 cases by Order dated October 30, 2009 [Case No. 09-13760, D.I. 14]. On

March 6, 2010 (the "Petition Date"), Centaur, LLC and certain of its direct and indirect

subsidiaries (the "New Debtors" and together with the First Filed Debtors, the "Debtors")

commenced cases under chapter 11 of the Bankruptcy Code in this Court. I am the Chief

Financial Officer, Executive Vice President, Secretary and Treasurer of Centaur, LLC, which is

the direct or indirect parent of each of the other Debtors. I have been employed by the Debtors

for seventeen years. As such, I am familiar with the day-to-day operations, business and

financial affairs of the Debtors.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Centaur, LLC (8148); Centaur Colorado, LLC (9131); Centaur Indiana, LLC; Centaur Racing, LLC; Hoosier Park, L.P. (0820); HP Dining & Entertainment, LLC; Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP (6808); Valley View Downs, LP (1028); Centaur PA Land Management, LLC; Centaur PA Land General Partner, LP; and Centaur PA Land, LP.

2.      I submit this declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' first day motions and applications (the "First Day Motions"). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the operations and financial affairs of the Debtors. If I were called upon to testify, I would testify competently to the facts set forth in this declaration. I am authorized to submit this declaration.

I.

## NATURE OF THE DEBTORS' BUSINESSES AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.      The Bankruptcy Cases

3.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No creditors' committee has yet been appointed in these cases. Further, no examiner or trustee has been requested or appointed in any of the Debtors' chapter 11 cases.

### B.      Overview of the Debtors' Business Operations

5.      The Debtors are leading domestic horse racing, off-track betting ("OTB") and casino operators with approximately 219,000 square feet of combined gaming space. The Debtors currently own, operate and/or have interests in racing and casino facilities in five distinct gaming markets in Indiana and Colorado, with a project in progress in northwest Pennsylvania. The Debtors employ approximately 1,300 full and part-time individuals.

6.    The Debtors own and operate Hoosier Park, a casino and horse racing track in Anderson, Indiana, along with three OTB facilities located in downtown Indianapolis, Fort Wayne, and Merrillville (the "OTB Facilities"). Hoosier Park is one of two horse racing tracks in Indiana with seating capacity for 2,750 racing patrons and offering 143 days of live racing per year. Fully integrated with Hoosier Park's racing facilities is a Las Vegas-style 92,000 square-foot casino building with nine bars and restaurants. The single-level casino floor features 2,000 slot machines and electronic table games, including craps, poker, blackjack and roulette. The three OTB Facilities average 22,500 square feet and seat 400 patrons, on average.

7.    The Debtors also own the Fortune Valley Hotel & Casino ("Fortune Valley") in Central City, Colorado, located approximately 35 miles west of Denver. Fortune Valley's 37,000 square feet of gaming space offers nearly 750 slot, video poker and video keno machines and live table games, including craps, roulette, blackjack and poker. The two-floor complex also offers three restaurants, two bars and a multi-story hotel featuring 118 guest rooms and a parking garage.

8.    The Debtors hold a racing, gaming and entertainment development opportunity, to be known as "Valley View Downs", in Lawrence County, Pennsylvania, 55 miles northwest of Pittsburgh. The Debtors currently own approximately 250 acres of land upon which they plan to construct Valley View Downs. In September 2007, the Debtors secured a racing license for Valley View Downs which entitles the Debtors to a gaming license subject to securing certain regulatory approvals. As of the Petition Date, the Debtors have not yet secured all necessary approvals and licenses for the completion of Valley View Downs.

9.    The Debtors' businesses generate positive cash flow from operations. For the fiscal year ended December 31, 2008, the Debtors generated approximately $184 million in

revenues. For the fiscal year ended December 31, 2009, the Debtors generated approximately $277.5 in revenues. As of the Petition Date, the Debtors' books and records (on a consolidated basis) reflected assets totaling approximately $584 million and liabilities totaling approximately $681 million.

### C. Corporate Structure

10. As shown by the organizational chart below, the Debtors are Centaur, LLC, and certain of its wholly-owned, direct and indirect subsidiaries. Centaur, LLC is a wholly-owned direct subsidiary of Centaur Gaming, LLC ("Holdings"). Holdings is wholly-owned by Centaur, Inc. (together with Centaur, LLC, Holdings and their affiliates and subsidiaries, including the Debtors, the "Company"). Centaur, LLC is the operating company that coordinates the management of the Hoosier Park (and related OTB Facilities) operations, the Fortune Valley operations and the proposed Valley View Downs operations. Neither Centaur, Inc. nor Holdings is a Debtor in these chapter 11 cases.



11.  In connection with guarantees of the First and Second Lien Debt (each as defined below) issued by Centaur, LLC's direct and indirect subsidiaries, there are thirteen restricted subsidiaries of Centaur, LLC, including Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP; Valley View Downs, LP; Centaur PA Land Management, LLC; Centaur PA Land General Partner, LP; Centaur PA Land, LP; HP Dining & Entertainment, LLC; Hoosier Park, L.P.; Centaur Racing, LLC; Centaur Indiana, LLC; and Centaur Colorado, LLC (collectively, the "Restricted Subsidiaries"), and five unrestricted subsidiaries of Centaur, LLC (collectively, the "Unrestricted Subsidiaries"). The Restricted Subsidiaries own substantially all of the Company's material assets. The Unrestricted Subsidiaries currently generate no revenue and hold no material assets other than approximately 194 acres of land in Pennsylvania. The Unrestricted Subsidiaries are not Debtors in these

chapter 11 cases.

**D.    Debt Structure**[2]

12.    First Lien Debt.  On or about September 17, 2008, Holdings, Centaur,

LLC and the Restricted Subsidiaries entered into a $610 million amended and restated first lien

revolving credit and term loan agreement (the "First Lien Credit Facility") with Credit Suisse,

Cayman Islands Branch ("Credit Suisse"), as administrative agent and collateral agent (the "First

Lien Agent"), and certain lenders from time to time party thereto (collectively, the "First Lien

Lenders," and together with the First Lien Agent, the "First Lien Secured Parties").  The First

Lien Credit Facility provides for (i) a first lien security interest in, and lien on, substantially all

property and assets of Centaur, LLC and the Restricted Subsidiaries (collectively, the

"Collateral"), (ii) a first lien guarantee of all obligations under the First Lien Credit Facility and

related documents by the Restricted Subsidiaries and (iii) a first lien equity pledge by Holdings

of all its equity interests in Centaur, LLC.  In addition, Centaur, LLC entered into certain Interest

Rate Swap Agreements (collectively, the "Swaps") with Credit Suisse to manage the risk

associated with the variable interest rate under the First Lien Credit Facility.  Obligations owing

under the Swaps are secured ratably with the obligations owing under the First Lien Credit

Facility.

13.    As of the Petition Date, not less than $382.5 million in principal amount

was outstanding under the First Lien Credit Facility comprised of:  approximately $15 million

outstanding under the revolving loan, approximately $338.8 million outstanding under the term

loan and approximately $28.7 million recorded as a liability under the Swaps (and with all

---

[2]      To the extent there is any conflict between the description of the Debtors' debt structure set forth herein
and the description of the Debtors' debt structure set forth in any interim order entered by the Court (the "Interim
Cash Collateral Order") granting the Debtors' emergency motion for, among other things, use of cash collateral,
which is being filed contemporaneously herewith, the description of the Debtors' debt structure set forth in the
Interim Cash Collateral Order shall control.

accrued but unpaid interest, costs, fees, charges and expenses (including default interest, as applicable) owing under the First Lien Credit Facility and the Swaps, collectively, the "First Lien Debt").

14.     Second Lien Debt. On or about September 17, 2008, Holdings, Centaur, LLC and the Restricted Subsidiaries entered into a $180 million amended and restated second lien revolving and term loan agreement (the "Second Lien Credit Facility") with Wells Fargo as administrative agent and collateral agent (the "Second Lien Agent") and certain lenders from time to time party thereto (collectively, the "Second Lien Lenders," and together with the Second Lien Agent," the "Second Lien Secured Parties," and together with the First Lien Secured Parties, the "Prepetition Secured Parties"). The Second Lien Credit Facility provides for (i) a second lien security interest in, and lien on, the Collateral, (ii) a second lien guarantee of all obligations under the Second Lien Credit Facility and related documents by the Restricted Subsidiaries and (iii) a second lien equity pledge by Holdings of all its equity interests in Centaur, LLC.

15.     As of the Petition Date, approximately $192 million in principal amount was outstanding under the Second Lien Credit Facility (the "Second Lien Debt").

16.     Pennsylvania Cash Collateralized L/C. In October 2007, Credit Suisse AG, Cayman Islands Branch (the "L/C Issuer") extended a letter of credit in the amount of $50 million (the "Existing L/C") to the Commonwealth of Pennsylvania in connection with the Debtors' application for a gaming license in Pennsylvania. The L/C Issuer holds a $50 million cash deposit in an account in the name of the L/C Issuer to secure the Existing L/C.

17.     The Existing L/C was set to expire by its terms on October 30, 2009. The Debtors were unable to obtain an extension of the Existing L/C absent the grant of protections

that only this Court could provide. As a consequence, the First Filed Debtors filed chapter 11

cases in this Court on the Original Petition Date. The Court approved an initial amendment of

the Existing L/C by the L/C Issuer to extend the term thereof until January 29, 2010 on an

interim basis on October 30, 2009 [Case No. 09-13760, D.I. 15] and on a final basis on

November 23, 2009 [Case No. 09-13760, D.I. 50]. The Court approved a further amendment of

the Existing L/C by the L/C Issuer to extend the term thereof for an additional ninety days until

April 29, 2010 by Order dated January 25, 2010 [Case No. 09-13760, D.I. 82].

### E.    Events Leading Up to These Chapter 11 Cases

18.    The Debtors have suffered substantial delays related to the licensing and

construction of Valley View Downs. The lack of cash flow from this project, combined with the

payment of a $250 million licensing fee in Indiana, and the weakened economy have created a

situation where operations do not generate sufficient cash flow to support the interest expense

under the First and Second Lien Credit Facilities.

19.    On October 27, 2009, scheduled interest payments were due to the First

and Second Lien Lenders under the First and Second Lien Credit Facilities. While the Debtors

have adequate liquidity to operate their businesses, they failed to make such interest payments

because they did not have sufficient liquidity to cover the interest payments. Since then, the

Debtors have been operating in default of their obligations under the First and Second Lien

Credit Facilities while engaging in negotiations with their lenders regarding a consensual,

comprehensive restructuring of their debt and a recapitalization of their businesses. Although the

Debtors have made substantial progress toward reaching a consensual agreement with the First

Lien Lenders and anticipate filing a proposed plan of reorganization in the very near term,

discussions with their lenders remain ongoing.

20.      Pursuant to that certain Intercreditor Agreement, dated October 30, 2007, and amended on September 18, 2008, among Centaur, LLC, the First Lien Lenders and Second Lien Lenders, the Second Lien Lenders were prohibited from exercising any remedy for any default under the Second Lien Credit Facility until March 6, 2010—the 120th day following the date upon which the collateral agent under the Second Lien Facility declared the existence of an event of default under the Second Lien Credit Facility (the "Standstill Period"). The Debtors determined that, once the Standstill Period expired, it would no longer be prudent to continue operating without the protection of this Court. Consequently, to preserve the Debtors' businesses as going concerns and to facilitate the restructuring of their debt, the New Debtors commenced chapter 11 cases on the Petition Date to obtain the protection that only this Court could provide.

## II.

## FACTS IN SUPPORT OF FIRST DAY MOTIONS

21.      Concurrently with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions. The Debtors request that the relief sought in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in achieving the successful rehabilitation and reorganization of the Debtors for the benefit of all parties in interest.

### A.      Debtors' Motion for an Order Directing Joint Administration of the Chapter 11 Cases (the "Joint Administration Motion")

22.      By the Joint Administration Motion, the Debtors seek the joint administration of their chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").[3]

23.     I understand that if the Court approves joint administration of the Debtors' chapter 11 cases, the Debtors will be able to reduce fees and costs resulting from the administration of these cases and ease the onerous administrative burden of having to file multiple documents. I have also been advised that joint administration will ease the administrative burden for the Court and all parties to these chapter 11 cases and obviate the need for duplicative notices, motions, applications and orders, and thereby save time and expense for the Debtors and their estates.

24.     Based on the foregoing, the Debtors believe that joint administration of the chapter 11 cases is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

**B.     Debtors' Motion for an Order Directing that Certain Orders and Other Pleadings Entered or Filed in the Chapter 11 Cases of Affiliated Debtors Be Made Applicable to Recently Filed Cases (the "Applicability Motion")**

25.     By the Applicability Motion, the Debtors request, pursuant to section 105(a) of the Bankruptcy Code, that the Court enter an order directing that certain orders previously entered in the First Filed Debtors' chapter 11 cases (collectively, the "Pre-Existing Orders") apply to the New Debtors in their chapter 11 cases.

26.     Specifically, the Debtors seek to have the following Pre-Existing Orders apply to the New Debtors effective *nunc pro tunc* to the Petition Date:

- Order Authorizing the Debtors to Employ Professionals Used in the Ordinary Course of Business [Case No. 09-13760, D.I. 55]

---

[3]     By Order dated October 30, 2009 [Case No. 09-13760, D.I. 14], the chapter 11 cases of the First Filed Debtors are already being jointly administered under the case of Centaur PA Land, LP Case No. 09-13760 (KJC) (the "Lead Case"). The Joint Administration Motion requests that the chapter 11 cases of the New Debtors be jointly administered under the Lead Case along with those of the First Filed Debtors.

- Order Authorizing Employment and Retention of Fox Rothschild LLP as Co-Counsel for the Debtors [Case No. 09-13760, D.I. 83]

- Order Authorizing the Employment and Retention of White & Case LLP as Attorneys for the Debtors *Nunc Pro Tunc* to the Petition Date [Case No. 09-13760, D.I. 84]

The Debtors seek the foregoing relief in an effort to eliminate the filing of duplicative motions, and therefore, reduce the burdens on this Court and parties in interest.

27.     I have been advised by counsel that entry of an order directing that the Pre-Existing Orders be made applicable to the New Debtors will (i) obviate the need for duplicative notices, motions and orders to be filed in the New Debtors' chapter 11 cases, (ii) save the New Debtors considerable time and expense and (iii) reduce the burden on the Court and parties in interest. If the Applicability Motion is not granted, the New Debtors would seek substantially the same substantive relief granted in the Pre-Existing Orders. Had the New Debtors filed chapter 11 petitions at the same time as the First Filed Debtors, they would have been movants with respect to the Pre-Existing Orders.

C.     **Debtors' Motion for an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, Schedules of Current Income and Expenditures and Statements of Financial Affairs (the "Schedules and Statements Motion")**

28.     By the Schedules and Statements Motion, the Debtors seek, pursuant to Bankruptcy Rule 1007 and Local Rule 1007-1, the entry of an order extending the time within which the Debtors must file their (i) schedules of assets and liabilities; (ii) schedules of executory contracts and unexpired leases; (iii) schedules of current income and expenditures; and (iv) statements of financial affairs (collectively, the "Schedules and Statements") to sixty days from the Petition Date, through and including May 5, 2010 (the "Requested Deadline"), without prejudice to the Debtors' ability to request additional extensions should it become necessary.

29. For the avoidance of doubt, in order to ease the administrative burden to the Debtors' estates and to ensure the orderly and coordinated preparation of the Debtors' Schedules and Statements, the Debtors request that the Requested Deadline also apply to the First Filed Debtors, thereby extending the time within which the First Filed Debtors must file their Schedules and Statements from March 15, 2010 through and including May 5, 2010.

30. The size and complexity of the Debtors' operations and the volume of material that must be compiled and reviewed by the Debtors' limited staff to complete the Schedules and Statements for each of the Debtors, especially during the days leading up to the filing of the petitions and the hectic early days of these chapter 11 cases, provide cause justifying the requested extension.

31. The Debtors are comprised of several affiliated entities with operations in Pennsylvania, Indiana and Colorado. Despite their best efforts, because of, among other things, the size of the Debtors' businesses and the limited staffing available to perform the required internal review of their accounts and affairs and the extensive efforts that the Debtors' management and other professionals devoted to negotiating with key creditor constituencies leading up to the filing of these chapter 11 cases, the Debtors were unable to assemble, prior to the Petition Date, all of the information necessary to complete and file the Schedules and Statements.

32. Moreover, given the numerous critical operational matters that the Debtors' accounting staff must address in the early days of these cases, the Debtors will not be in a position to complete the Schedules and Statements within the time requirements specified in Bankruptcy Rule 1007 and Local Rule 1007-1(b). Completing the Debtors' Schedules and Statements will require the Debtors and their advisors to collect, review and assemble massive

amounts of information from their books and records. Assembling the necessary information would require a significant expenditure of the Debtors' time and effort, as well as that of their employees, at a time when such resources would be best spent towards assisting the Debtors' reorganization efforts. Nevertheless, recognizing the importance of the Schedules and Statements in these chapter 11 cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances.

33.     The Debtors acknowledge that the circumstances of these chapter 11 cases are unique given the prior filing of the First Filed Debtors and given that the First Filed Debtors have received more than one extension of the time to file their Schedules and Statements.[4] Nevertheless, the Debtors believe it would ease administrative burdens on the Debtors' management and increase the likelihood that all of the Schedules and Statements will be accurate if they are permitted to prepare the Schedules and Statements for all of the Debtors as part of a single coordinated process. The Debtors do not believe that any party in interest will be prejudiced if the Requested Deadline is made applicable to all of the Debtors.

---

[4]     After the First Filed Debtors filed for bankruptcy protection, while the Company continued negotiations with the First and Second Lien Lenders, and pending an agreement with the First and Second Lien Lenders regarding a global restructuring, the First Filed Debtors sought extensions of time within which to file their Schedules and Statements to effectively maintain the status quo in order to reduce (i) the administrative costs to the First Filed Debtors' estates as well as (ii) the administrative burden on the Court with respect to these chapter 11 cases. By Order dated December 2, 2009, the Court granted the initial extension of the First Filed Debtors' time to file their Schedules and Statements, extending the deadline through and including December 14, 2009 [Case No. 09-13760, D.I. 56]. On January 4, 2010, the Court granted a second extension of the First Filed Debtors' time to file their Schedules and Statements, extending the deadline through and including January 13, 2010 [Case No. 09-13760, D.I. 68]. Then, on January 25, 2010, the Court granted a third extension of the First Filed Debtors' time to file their Schedules and Statements, extending the deadline through and including March 15, 2010 [Case No. 09-13760, D.I. 85].

**D.** **Debtors' Motion for an Order Authorizing the Debtors to File (I) a Consolidated Master List of Creditors and (II) a Consolidated List of Creditors Holding the Thirty Largest Unsecured Claims (the "Consolidated Creditors List Motion")**

34. The Debtors are leading domestic horse racing, OTB and casino operators. Their businesses comprise a complex enterprise with myriad operations in multiple states. The Debtors have thousands of creditors. I have been advised that these creditors and other parties in interest must be provided notice of certain proceedings in these chapter 11 cases.

35. By the Consolidated Creditors List Motion, the Debtors seek entry of an order authorizing the Debtors to file (i) a consolidated master list of creditors and (ii) a consolidated list of creditors holding the thirty (30) largest unsecured claims in these chapter 11 cases in lieu of filing separate lists for each Debtor.

36. The Debtors presently maintain—on a consolidated basis—various computerized lists of the names and addresses of their respective creditors that are entitled to receive the notices and other documents in these cases. The Debtors believe that the information, as maintained in these computer files (or those of their agents), can be used most efficiently to provide interested parties with the notices and other similar documents, as contemplated by Local Rule 1007-2, if consolidated (as opposed to creating a separate list for each Debtor). Accordingly, by the Consolidated Creditors List Motion, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors in the format or formats currently maintained in the ordinary course of the Debtors' businesses.

37. Concurrently with the Consolidated Creditors List Motion, the Debtors have filed an application for an order authorizing the retention and employment of AlixPartners, LLP as noticing, claims and balloting agent. If the application is granted, AlixPartners, LLP will, among other things, (a) access the Debtors' computer records to create a consolidated

creditor database and (b) complete the mailing of the applicable notices to the parties in this database, as required by Bankruptcy Rule 2002. After consultation with AlixPartners, LLP, the Debtors believe that filing a consolidated master list of creditors in the consolidated format or formats currently maintained in the ordinary course of business will enable AlixPartners, LLP to provide notice most efficiently to all entitled parties as required by Local Rule 1007-2.

38.     Given the size and complexity of the Debtors' businesses, I have been advised that filing a consolidated list of creditors holding the 30 largest unsecured claims (the "Consolidated Top 30 List") against the Debtors would facilitate the review of creditors' claims and the appointment of a creditors' committee by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").

39.     Furthermore, the Debtors anticipate that most claims will be asserted only against certain of the Debtors, including Hoosier Park L.P., Centaur, LLC, and Centaur Colorado, LLC.

40.     Accordingly, the Debtors request authority to file the Consolidated Top 30 List in lieu of separate top 20 lists for each Debtor. The Debtors believe that such relief is appropriate under the circumstances for the efficient and orderly administration of these chapter 11 cases.

E.      **Debtors' Application for an Order Authorizing and Approving the Employment and Retention of AlixPartners, LLP as Noticing, Claims and Balloting Agent in These Chapter 11 Cases *Nunc Pro Tunc* to the Petition Date (the "Claims Agent Application")**

41.     By the Claims Agent Application, the Debtors request entry of an order, pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f) authorizing and approving the employment and retention of AlixPartners, LLP ("AlixPartners") as noticing, claims and balloting agent (the "Claims Agent") in the Debtors' chapter 11 cases, to be effective *nunc pro*

*tunc* to the Petition Date, to, among other things, serve as the Court's noticing agent and mail notices to the Debtors' creditors and other parties in interest and provide claims, claims objections and balloting services.

42.     Subject to the Court's approval, AlixPartners will provide the services set forth in the Claims Agent Application pursuant to the terms of the engagement letter dated March 4, 2010, which is attached to the Claims Agent Application.

43.     The Debtors estimate that there are thousands of creditors in these chapter 11 cases. Additionally, I have been advised that the Debtors will need assistance in managing and addressing the myriad of administrative issues amongst the Debtors and the parties in interest that will likely arise in these chapter 11 cases.

44.     The Debtors seek to retain AlixPartners as the noticing, claims and balloting agent because of the firm's experience in serving in such capacity in chapter 11 cases of this size and the reasonableness of its fees. In preparing for these cases, AlixPartners has become familiar with the Debtors' businesses and affairs and many of the potential issues that may arise in the context of these cases. Accordingly, I believe that AlixPartners is both well qualified and uniquely able to represent the Debtors as the Claims Agent.

F.      **Debtors' Motion for an Order (I) Authorizing Continued Use of Existing (A) Cash Management Systems, (B) Bank Accounts and (C) Business Forms; (II) Granting Administrative Expense Priority Status to Certain Intercompany Transactions; and (III) Waiving Investment and Deposit Requirements (the "Cash Management Motion")**

45.     The Debtors' cash management systems, as described in the Cash Management Motion, are necessary not only for the efficient functioning of the Debtors' businesses, but also to comply with the strict regulations imposed by the gaming and racing authorities. For an enterprise like that of the Debtors, whose operations are so highly dependent

on their ability to manage the high volume of cash receipts and cash disbursements received and made on a daily basis, maintaining their existing cash management systems is crucial.

46. By the Cash Management Motion, the Debtors respectfully request that this Court enter an order pursuant to sections 105, 345, 363, 364, 503, 507, 1107 and 1108 of the Bankruptcy Code and Local Rule 2015-2 (i) authorizing the continued use of the Debtors' existing (a) cash management systems as described below and in the Cash Management Motion, (b) bank accounts set forth on Exhibit A annexed to the Cash Management Motion (collectively, the "Bank Accounts") and (c) business forms; (ii) granting administrative expense priority status to certain Intercompany Transactions (as defined below) and (iii) waiving investment and deposit requirements.

47. "Cages". With limited exceptions, the Debtors maintain separate cash management systems for each of their different business segments. Revenue is primarily generated from (i) wagers at the Hoosier Park casino; (ii) wagers taken on horseracing at Hoosier Park and the associated OTB Facilities; (iii) wagers at the Fortune Valley casino; (iv) hotel revenues at Fortune Valley and (v) food and beverage sales at the Debtors' facilities.[5] Most revenues are in the form of cash receipts from patrons on the gaming floors and at the wagering stations, which are initially collected at the respective "cages" at each facility. Credit card revenues are processed by a third-party provider and deposited in the relevant Debtor's operating account.

---

[5]     There are certain Bank Accounts in place at Valley View Downs, including an account into which funds from the First and Second Lien Credit Facilities were originally allocated, a construction disbursement account, and since shortly after the Original Petition Date, a debtor-in-possession operating account (which replaced its former operating account). Until the necessary licenses and approvals are secured, construction on the Valley View Downs project has been halted. Valley View Downs does not generate any revenue, and the only expenses associated with the project relate to payments to facilitate maintaining the future development opportunity.

48.     Fortune Valley and Hoosier Park Operating Accounts. Fortune Valley and Hoosier Park[6] are each required by statute to maintain specific cash reserves in their cages to pay winners at their facilities. See Colo. Rev. Stat. § 47.1-1612; 68 Ind. Admin. Code § 15-3-3. The cash-reserve requirements for the cages are necessary to ensure that each facility can satisfy payouts to winning customers. Excess funds, above the statutorily-required reserves and amounts that are reasonably necessary to operate the Debtors' business, are physically deposited into the respective operating accounts of Fortune Valley and Hoosier Park.

49.     OTB Facilities' Depository Accounts. Each of the OTB Facilities also maintains it own depository account or accounts. In the case of the Indianapolis OTB Facility, monies from its depository account, which originate from that facility's cage and are comprised of horse racing revenues, are transferred to a second depository account where they are combined with a portion of the gaming revenues collected in the Hoosier Park cage and used to pay, on a daily basis, pari-mutuel taxes due to the State of Indiana. Monies from the depository accounts of the Merrillville and Fort Wayne OTB Facilities, which originate from those facilities' cages and are comprised of horse racing revenues, are deposited into the Hoosier Park operating account.

50.     Disbursement Accounts. Disbursements are made from the respective operating accounts of Fortune Valley and Hoosier Park through "zero-balance" accounts, funded with monies from the operating accounts and maintained for payments to vendors and service providers or to pay large payouts to winning patrons. These zero-balance accounts allow funds to be swept in and out of the accounts as needed to satisfy the Debtors' obligations. Additionally, the Debtors maintain specialized disbursement accounts to satisfy employee-

---

[6]     Hoosier Park has two "cages" because revenue from horse racing wagers and gaming revenue must be maintained separately. Each of the three affiliated OTB Facilites also maintains its own "cage."

related expenses, employee benefits and obligations to taxing and regulating authorities, which are also funded with monies from the operating accounts of Fortune Valley, Hoosier Park and Centaur, LLC.[7]

51.    Horsemen Accounts. The Debtors award "purses"[8] to the owners (the "Horsemen") of the horses that win the races held at Hoosier Park. Rather than taking possession of the purse funds as they are awarded, many of the Horsemen ask that the Debtors hold such purse funds for them during the racing season (the funds held on behalf of those Horsemen, the "Individual Horsemen Accounts"). The Debtors make periodic deposits to and disbursements for the Horsemen from the Individual Horsemen Accounts throughout the racing season. Accordingly, the Debtors currently maintain over 1,300 Individual Horsemen Accounts. Additionally, the Debtors are required by statute and regulation to allocate certain portions of gaming and racing revenue at Hoosier Park to pay purses in future races. These future-purse funds are maintained in segregated "trust" accounts for each breed (i.e., thoroughbred, standardbred, and quarterhorse) (the "Future Purse Accounts," and together with the Individual Horsemen Accounts, the "Horsemen Accounts"), which are to be held by the Debtors in trust and are transferred from the Future Purse Accounts to pay future purses to winning Horsemen.

52.    Intercompany Transactions. From time to time, in order to fund the operating expenses of Centaur, LLC, monies are transferred from the operating accounts of Fortune Valley and Hoosier Park to the operating account of Centaur, LLC. Monies in that account are used to pay "corporate" payroll and operating expenses and, prior to the Original

---

[7]    The Debtors also maintain certain other de minimis, closed or inactive accounts included in Exhibit A to the Cash Management Motion, which are still in place because of prior use, convenience, anticipated future use and/or regulatory requirements.

[8]    "Purses" refer to the cash-prizes due to the winning horses in a race.

Petition Date, interest on the First and Second Lien Debt. Typically, these transfers are recorded as payments of accrued interest on amounts allocated by Centaur, LLC to Fortune Valley and Hoosier Park, respectively, on account of borrowings under the First and Second Lien Credit Facilities.

53. In addition to the transfer of monies from the operating accounts of Fortune Valley and Hoosier Park to the operating account of Centaur, LLC, as described above, the Debtors engage in intercompany transfers (collectively, the "Intercompany Transactions"), which include periodic funding by Centaur, LLC of the shortfalls in working capital requirements of Fortune Valley and Valley View Downs. These transfers were made by the Debtors in the ordinary course of their businesses. If the Intercompany Transactions were discontinued, the Debtors' cash management system and related administrative controls, which consisted of these Intercompany Transactions being recorded on a "due to/due from" basis, would be disrupted to the detriment of the Debtors. As a result, the Debtors maintain records of these transfers and can ascertain, trace and account for these Intercompany Transactions.

54. The Debtors will continue to maintain such records, including records of all intercompany accounts receivable and payable and payments made on behalf of intercompany payables. Additionally, to protect the interests and preserve the relative priorities of the Prepetition Secured Parties, the Debtors request that all Intercompany Transactions effected after the Petition Date be accorded administrative expense priority status of the kind specified in sections 503(b) and 507(a)(2) of the Bankruptcy Code to permit the exercise of intercompany setoff rights.

55. The Debtors' cash management systems constitute ordinary course and essential business practices providing significant benefits to the Debtors, including the ability to

20

control funds, ensure the maximum availability of funds when and where necessary, satisfy regulatory requirements and obligations and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. The Debtors submit that the cost and expense of changing the Bank Accounts and implementing new cash management systems would not only force the Debtors to incur significant costs and expenses, but would impair the operation of the Debtors' businesses, cause confusion, diminish prospects for a successful reorganization, introduce inefficiency at a time when efficiency is most critical and place a strain on the Debtors' relationships with customers, vendors and regulators. The Debtors intend to continue to maintain strict accounting records, including with respect to receipts, disbursements and intercompany transfers, so that the U.S. Trustee and parties in interest may readily monitor the Debtors' financial activities.

56.     The Debtors request that (i) Wells Fargo Bank, N.A. and First Merchants Bank of Central Indiana, N.A., at which the Debtors maintain segregated payroll accounts, and (ii) The National Bank of Indianapolis, at which general operating accounts are maintained from which payroll checks are issued directly to third-party payroll providers,[9] be authorized to continue to honor payroll checks (to the extent sufficient funds are on deposit to honor such checks) without regard to when such payroll checks were issued. Such relief is necessary to implement the relief requested by the Debtors' motion filed simultaneously herewith seeking authority to, among other things, pay prepetition wages owing to the Debtors' employees. The Debtors intend to provide notice of entry of the order granting the Cash Management Motion to all banks listed on Exhibit A to the Cash Management Motion (collectively, the "Banks") within

---

[9]     Hoosier Park and Fortune Valley maintain segregated payroll accounts at First Merchants Bank of Central Indiana, N.A. and Wells Fargo Bank, N.A., respectively. Centaur, LLC makes payroll disbursements directly from its operating accounts at The National Bank of Indianapolis.

two business days of the entry of such an order approving the Cash Management Motion.

57. The Debtors also request permission to use their existing business forms and stationery without alteration or change. Parties doing business with the Debtors will be aware of the Debtors' status as chapter 11 debtors in possession. In addition, the Debtors do not print their own business forms and stationery. Thus, substantial time and expense would be required if the Debtors were required to print new business forms and stationery merely to indicate "debtor in possession." Changing the business forms at this critical, early stage of their chapter 11 cases would be unduly burdensome to the administration of the Debtors' estates and present an unnecessary distraction and disruption to the Debtors' business operations.

58. Finally, the Debtors respectfully request authority to maintain their cash in the Bank Accounts in a safe and prudent manner, in accordance with their existing deposit and investment practices pending a final hearing on the Cash Management Motion if one is requested.

G. **Debtors' Motion for Authority to Honor Prepetition (I) Obligations to Customers and Otherwise Continue Customer Programs, and (II) Horsemen Accounts in the Ordinary Course of Business (the "Customer Programs Motion")**

59. Prior to the Petition Date, in the ordinary course of their businesses and as is customary in the industries in which the Debtors operate, the Debtors implemented certain customer programs (collectively, the "Customer Programs")[10] (i) to maintain their competitive advantage by ensuring customer satisfaction, increasing attendance and wagering at the Debtors' facilities, enhancing customer loyalty and generating goodwill and (ii) with regard to Cage Accounts (as defined below), comply with state gaming laws and regulations.

---

[10]     Such Customer Programs include Outstanding Wagering Obligations, Progressive Slot & Poker Liabilities, Cage Accounts, Patron Reward Programs, Gift Certificates & Coupons and Promotions (each as defined and described more fully below).

60. The Customer Programs are fundamental to the continued success of the Debtors' businesses. The Customer Programs, by design, encourage repeat business and ensure customer satisfaction, thereby retaining current customers, attracting new customers and ultimately increasing the Debtors' revenues. If the Debtors were unable to offer the Customer Programs, they would be at a significant disadvantage compared to their competitors. Therefore, it is integral that the Debtors are able to assure customers of their ability to satisfy prepetition obligations under the Customer Programs following the commencement of these chapter 11 cases.

61. If the Debtors are unable to continue to honor their commitments under the Customer Programs, it would undoubtedly result in a loss of goodwill among the Debtors' customers and a loss of revenue that could threaten the success of the Debtors' reorganization efforts. Moreover, failure to maintain and honor obligations under certain Customer Programs would result in a violation of certain state gaming and racing laws which could potentially impact the Debtors' licenses.

## 1. Customer Programs

### a. Outstanding Wagering Obligations

62. The Debtors have outstanding obligations as of the Petition Date to customers that placed wagers in the casinos or on horse races. If these patrons placed winning wagers, but, for a variety of reasons, failed to redeem their winning tickets (the "Unclaimed Winnings"), the Debtors are liable if the customers redeem those winning tickets at a later date.[11]

---

[11] In Indiana, unclaimed winning racing tickets are only redeemable during the calendar year, plus sixty (60) days, in which the wager was made. On March 15 of each year, the Debtors must remit the winnings from such racing tickets to the Indiana Horse Racing Commission if unclaimed. On March 15, 2010, the Debtors must remit approximately $460,000 for all uncashed 2009 mutuel tickets, which will reduce the balance of Outstanding Wagering Obligations accordingly. Such payment will be made pursuant to the relief requested in the Debtors' motion seeking authority to pay certain taxes and fees, filed concurrently herewith, to, among others, racing regulatory authorities.

Additionally, some patrons leave the Debtors' facilities with gaming currency or vouchers[12] (the "Outstanding Wagering Currency," and together with the Unclaimed Winnings, the "Outstanding Wagering Obligations").

63.     By assuring customers that Outstanding Wagering Obligations will be paid, the Debtors will provide a powerful incentive for customers to return to their facilities, where they will undoubtedly make future wagers and spend additional funds on food, beverages and other merchandise and services. Ultimately, the Debtors believe that the additional money spent at the Debtors' facilities by returning customers will far exceed the Outstanding Wagering Obligations. The Debtors estimate that approximately $1.1 million in Outstanding Wagering Obligations remain outstanding as of the Petition Date.

## b.     Progressive Slot & Poker Liabilities

64.     Certain slot and poker machines maintained by the Debtors at Fortune Valley and Hoosier Park are progressive or multi-progressive gaming machines. Progressive gaming machines accrue value over a period of time based upon the amount of customer play at the machine. Multi-progressive machines accrue value in the same manner, but include multiple gaming machines that are linked together to form one jackpot. The Debtors are required to record these incremental increases in jackpots from customer play as liabilities for future jackpots that will be paid to winning customers (the "Progressive Slot & Poker Liabilities").

65.     Given the nature of these progressive gaming machines, it is inevitable that postpetition jackpots will consist of both prepetition and postpetition amounts that have been

---

[12]     The "vouchers" are the balance of a wager made on a race if the customer puts more money into a wagering machine than is used on the wager; the machine issues the customer a voucher which can then be redeemed for cash or used to place further wagers. Vouchers have no "expiration date" and the Debtors' policy is to honor all outstanding vouchers. Approximately $400,000 of the total Outstanding Wagering Obligations are attributable to vouchers that were inherited by the Debtors when they took over Hoosier Park in 2007. Some of these liabilities date back to 1997. The Debtors continue to account for such liabilities on their books and records, although the likelihood of payout on a portion of these vouchers is remote given the significant passage of time.

played on the machines. The Debtors estimate that approximately $875,000 in Progressive Slot & Poker Liabilities remain outstanding as of the Petition Date and request authority to honor the prepetition Progressive Slot & Poker Liabilities and to continue honoring, in their sole discretion, Progressive Slot & Poker Liabilities in the ordinary course of business.

### c. Cage Accounts

66.     In the ordinary course of business, and as required by statute, the Debtors maintain "house banks" called "cages" at Hoosier Park, Fortune Valley and the OTB Facilities (collectively, the "Cage Accounts"), in which the Debtors are required by applicable racing and gaming regulations to maintain cash reserves to pay winning patrons at their facilities.

67.     While the exact amount of funds held in the Cage Accounts fluctuates from time to time, the Debtors estimate that, as of the Petition Date, they hold approximately $11.5 million in the Cage Accounts. The Debtors seek to honor their customers' postpetition winnings from these prepetition cash reserves held in the Cage Accounts, and to continue honoring, in their sole discretion, cage obligations in the ordinary course of business.

### d. Patron Reward Programs

68.     The Debtors have instituted programs, akin to frequent-flyer programs, whereby patrons are awarded points for money (i) wagered on races and at the Debtors' gaming machines and tables, and (ii) spent on food, beverages, merchandise and other services at the Debtors' facilities (the "Patron Reward Programs"). Such points are redeemable for prizes, services, coupons, merchandise, "free play" and/or cash[13] (collectively, the "Rewards").

---

[13]     At Hoosier Park, points can be redeemed for "free play" at gaming machines, but not for cash. At Fortune Valley, however, points can be redeemed for cash, but "free play" is not offered.

69.     The Debtors estimate that they may have approximately $1.65 million[14] of outstanding commitments under the Patron Reward Programs as of the Petition Date. These Patron Reward Programs offer a powerful incentive for patrons to return to the Debtors' facilities. The Debtors request authority to honor the prepetition Patron Reward Programs obligations and to continue honoring, in their sole discretion, Patron Reward Programs obligations in the ordinary course of their business.

### e.     Gift Certificates & Coupons

70.     At Hoosier Park and Fortune Valley, the Debtors offer customers gift certificates, gift cards and coupons that may be redeemed for cash, hotel stay, dining, entertainment and retail merchandise at the Debtors' facilities (the "Gift Certificates & Coupons"). The Debtors estimate that, as of the Petition Date, their outstanding Gift Certificate & Coupon obligations total approximately $24,000. The Debtors request authority to honor the prepetition Gift Certificates & Coupons and to continue honoring, in their sole discretion, Gift Certificates & Coupons issued postpetition in the ordinary course of their business.

### f.     Promotions

71.     The Debtors coordinate contests, entertainment events and promotions, and offer group discounts (collectively the "Promotional Events") to attract customers to their facilities. The Promotional Events serve to increase customer attendance at the Debtors' facilities where customers will not only participate in the Promotional Events, but also will wager and spend money at the Debtors' facilities, thereby generating revenue for the Debtors.

---

[14]     Such amount will not be paid out at any one time, and for the portion of this amount that is attributable to Hoosier Park, the actual cost to the Debtors is much less than this booked liability because the Rewards available are only "free play" and food, beverages or merchandise (where the actual cost to the Debtors is significantly less than the actual retail cost of such products to the patrons).

As of the Petition Date, the Debtors held approximately $5,000 in funds for various future Promotional Events.

72.     The Debtors also extend promotional offers to potential and repeat patrons at their gaming facilities to encourage greater attendance and wagering at their gaming facilities (the "Promotional Offers," and together with the Promotional Events, the "Promotions"). The Promotional Offers primarily include coupons or certificates for "free play" at the gaming facilities. These Promotional Offers are made through bulk mailings, and only a relatively small percentage of the offers are actually redeemed before the offers expire. The Debtors estimate that liability for unexpired Promotional Offers that were mailed prior to the Petition Date is approximately $1.5 million.

73.     The Debtors request authority to honor their obligations for Promotions that are outstanding as of the Petition Date, up to an aggregate amount of $1.5 million, and to continue providing Promotions, in their sole discretion, in the ordinary course of business.

### 2.     Horsemen Accounts

74.     The Debtors award purses to the Horsemen that win the races held at Hoosier Park. Rather than taking possession of the purse funds as they are awarded, many of the Horsemen ask that the Debtors hold such purse funds for them during (and between) the racing seasons. The Debtors make periodic deposits and disbursements for the Horsemen from the Individual Horsemen Accounts throughout the racing season. Accordingly, the Debtors currently maintain over 1,300 Individual Horsemen Accounts. As of the Petition Date, the Debtors' liability in respect of the Individual Horsemen Accounts is approximately $330,000.

75.     Purses are funded pursuant to state regulations, which require the Debtors to record and hold a portion of the adjusted gross receipts from their gaming revenue and a

portion of pari-mutuel wagers in Indiana to pay future purses.[15] Historically, if the Debtors made the proper allocations pursuant to these regulations, the funds for future purses could be commingled with the Debtors' other funds so long as the Debtors could meet their obligations to award each purse to the winning Horsemen.

76. Commencing November 15, 2009, however, a new regulation[16] requires that the Debtors maintain these future-purse funds in Future Purse Accounts for each breed (i.e., thoroughbred, standardbred, and quarterhorse) which are to be held by the Debtors in trust to pay future purses to winning Horsemen and to fund other obligations to the Horsemen. The total liability associated with the Future Purse Accounts is approximately $7.9 million, which represents future amounts owed by the Debtors to the Horsemen for purses to be awarded in future races. Because of the recent change in regulations, which now require actual funding of the Future Purse Accounts, rather than merely book-entry allocations, the Future Purse Accounts are currently under funded by approximately $4.5 million. The regulation provides that the Debtors must cure this underfunding by no later than July 1, 2010.

77. Maintaining their obligations to the Horsemen fosters a continuing relationship between the Debtors and the Horsemen, who otherwise may not enter their horses in the races at Hoosier Park. The Debtors do not believe that (a) the amounts in, or underfunded amounts owed to, the Future Purse Accounts or (b) the amounts in the Individual Horsemen Accounts constitute property of their estates, but in an abundance of caution, the Debtors request authority to honor their prepetition obligations to the Horsemen by disbursing any amounts in, or

---

15 Pursuant to the same regulations, another portion of the adjusted gross receipts from the Debtors' gaming revenue in Indiana and a portion of pari-mutuel wagers is paid out to certain associations and funds for the benefit of the Horsemen. As of the Petition Date, the Debtors are current in their obligations to such associations and funds, and have no outstanding prepetition liabilities in respect thereof.

16 71 Ind. Admin. Code 4-2-7 (effective Oct 26, 2009).

curing any current underfunding of, the Horsemen Accounts, which they estimate at approximately $8.4 million in the aggregate.

78.     By the Customer Programs Motion, the Debtors request an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, authorizing the Debtors, in their business judgment, to honor their prepetition Customer Programs, Horsemen Accounts and related obligations in an aggregate amount not to exceed $25 million.

79.     The Debtors seek to continue their Customer Programs as such programs have proven to be (a) successful business strategies in the past and (b) responsible for generating valuable goodwill, repeat business and net revenue increases. The Debtors believe that continuing the Customer Programs throughout their chapter 11 cases is essential to (a) preserve customer relationships and goodwill for the benefit of their estates and (b) maximize revenue and the value of the Debtors' estates for the benefit of all stakeholders as the Debtors attempt to restructure their businesses.

80.     The Debtors' creditors also will benefit from the relief sought in the Customer Programs Motion. If the Debtors are prohibited from honoring and maintaining the Customer Programs in a manner consistent with their past business practices, customers will lose confidence in the Debtors and may begin to patronize the Debtors' competitors that do provide such programs, thereby damaging the Debtors' businesses to an extent that far exceeds the cost associated with honoring and continuing such practices. The relief requested in the Customer Programs Motion will protect the Debtors' goodwill and help maintain the value of their estates during this critical time.

81. The Customer Programs and Horsemen Accounts are essential to the Debtors' business operations and reorganization efforts, and the relief requested in the Customer Programs Motion is necessary to avoid immediate and irreparable harm to the Debtors.

II. **Debtors' Motion for an Order (I) Authorizing (A) Payment of Prepetition Wages, Compensation, Employee Benefits and Administrative Service Obligations; (B) Continuation of Workers' Compensation Programs and Payment of All Obligations in Respect Thereof; and (C) the Debtors' Financial Institutions to Honor and Process Checks and Transfers Related to such Obligations and (II) Granting Related Relief (the "Employee Motion")**

82. Prior to the Petition Date and in the ordinary course of their businesses, the Debtors paid their employees wages, salaries, tips and other compensation and benefits and paid amounts owed to administrators of, among other things, the Debtors' payroll and employee benefit plans. As such obligations accrue on an ongoing and continuous basis, but are paid periodically, the intervening bankruptcy filings have resulted in the accrual of unpaid prepetition wages, salaries, tips and/or other compensation owed to employees and related third parties.

83. By the Employee Motion, the Debtors seek authority to pay up to an aggregate amount of $2,035,000 to satisfy certain prepetition obligations owing to the Debtors' employees and related third-parties including, but not limited to, (a) amounts owed to employees for wages, salaries, tips and other compensation (the "Wages & Compensation"); (b) amounts necessary to maintain employee health and welfare plans (the "Employee Benefits"); (c) amounts owed to providers or administrators of, inter alia, the Debtors' payroll and employee benefit plans (the "Administrative Service Obligations") and (d) other miscellaneous employee expenses and benefits up to an aggregate amount of $75,000 (the "Miscellaneous Expenses", and together with the prepetition obligations on account of Wages & Compensation, Employee Benefits, and Administrative Service Obligations, the "Prepetition Employee Obligations").

84.     Honoring the Debtors' Prepetition Employee Obligations will minimize the hardship that employees will certainly endure if payroll is interrupted. Honoring such obligations will also prevent a loss of employees that may ensue as a result of the collective employees' loss of the reasonable expectation that they will be compensated for services rendered. As such, the Debtors seek to continue paying the Prepetition Employee Obligations in the ordinary course and request that the Court direct the banks at which the Debtors maintain segregated payroll accounts and the banks at which Centaur, LLC maintains its general operating account from which payroll checks are issued directly to third-party payroll providers to continue to honor payroll checks (to the extent sufficient funds are on deposit to honor such checks) without regard to when such payroll checks were issued.[17]

85.     In addition, the Debtors seek authority to continue and pay obligations related to their workers' compensation programs, including all undisputed premiums, deductibles, administrative fees and broker fees (the "Workers' Compensation Obligations"), on an uninterrupted basis and to honor their undisputed prepetition obligations thereunder.[18]

86.     Finally, the Debtors seek certain additional relief related to the primary relief sought in the Employee Motion, including, but not limited to, relief to forward all amounts withheld or deducted from their employees' paychecks (whether prepetition or postpetition) to the appropriate third parties.

## 1.    Prepetition Employee Obligations

### a.    Wages and Compensation

---

[17]     Hoosier Park and Fortune Valley maintain segregated payroll accounts at First Merchants Bank of Central Indiana, N.A. and Wells Fargo Bank, N.A., respectively. Centaur, LLC makes payroll disbursements to thirteen employees directly from its main operating account at The National Bank of Indianapolis.

[18]     For the avoidance of doubt, the Debtors also seek authority to make further payments in the ordinary course of or with respect to Wages & Compensation, Employee Benefits, Administrative Service Obligations and Workers' Compensation Obligations to the extent any such obligations arise after the Petition Date.

87.     The Debtors employ approximately 230 salaried employees and 1,073 active hourly employees.[19] The employees are paid bi-weekly, and the majority of the employees are paid one week in arrears, current through the date that is between three and four days prior to the applicable pay day, depending on their location.[20] The Debtors' gross, bi-weekly payroll averages approximately $1,500,000 in the aggregate, which includes employer paid FICA and other payroll taxes.[21]

88.     The Debtors estimate that, as of the Petition Date, approximately $1,950,000 in prepetition Wages & Compensation (including amounts relating to paid vacation time) may have accrued and is unpaid.[22] As of the Petition Date, the average amount that each employee is owed is approximately $1,500.[23] The Debtors respectfully request the authority to pay the Wages & Compensation in the ordinary course of business. The request to pay Wages & Compensation relates solely to employees and Independent Contractors who are employed as of the Petition Date. In addition, the Debtors seek authority to continue to pay Wages & Compensation in the ordinary course of business.

89.     Although the Debtors believe that most payroll checks issued prepetition have been presented to, and honored by the applicable drawee banks, the Debtors recognize that

---

[19]     The Debtors also contract with certain third-party individuals and companies (the "Independent Contractors") to provide essential services including, but not limited to, secure money transportation to the Debtors' banks and valet parking.

[20]     Employees of Centaur, LLC are paid bi-weekly, current through the applicable pay day.

[21]     The eleven executives, eleven senior managers and three general managers employed by the Debtors represent approximately 20% of the Debtors' aggregate payroll.

[22]     As of the Petition Date, the total accrued but unpaid compensation owed to the Independent Contractors is approximately $2,000 in the aggregate, an amount which is included within the Debtors' estimate for prepetition accrued but unpaid Wages and Compensation. The Debtors respectfully request the authority to pay the Independent Contractors accrued but unpaid compensation in the ordinary course of business to ensure no interruptions in the essential services provided by the Independent Contractors to the Debtors.

[23]     As of the Petition Date, no one employee is owed more than $10,950.

certain employees may fail to cash or deposit their paychecks in a timely manner. Accordingly, it is possible that some checks remain in float postpetition that banks will not honor absent explicit authority and direction to do so. While the Debtors do not believe significant amounts, remain owing for past payroll periods, to the extent any such amounts remain owing, the Debtors submit that the administrative costs resulting from determining such information with precision substantially exceed any benefit to be gained from such exercise. As the majority of the Debtors' executives, general managers and senior managers are paid by direct deposit, most of the checks in float represent compensation to the rank and file employees.[24] Accordingly, the Debtors request that their banks and other financial institutions at which the Debtors maintain disbursement accounts be authorized to honor payroll checks, which are in float but have not been presented or otherwise honored timely for payment.[25]

### b.    Employee Benefits

90.    In the ordinary course of their businesses, the Debtors have established the Employee Benefits, which include various employee benefit plans and policies that provide eligible employees with medical, dental, vision, short-term disability insurance, long-term disability insurance, life insurance and other similar benefits. By the Employee Motion, the Debtors seek authority to continue providing the Employee Benefits in the ordinary course of business and to, in their discretion, honor all liabilities to their employees for the Employee

---

[24]    Approximately half of the Debtors' rank and file employees are paid by direct deposit.

[25]    A component of the Debtors' employees' Wages and Compensation consists of paid vacation time. Employees receive up to five weeks of paid vacation annually depending upon the employee's position and length of service. As of the Petition Date, there was approximately $1,275,000 accrued, but unpaid, vacation time outstanding, an amount which is included within the Debtors' estimate for prepetition accrued but unpaid Wages and Compensation. The Debtors intend to permit employees to continue to use accrued, but unused, vacation time in the ordinary course and will pay cash in lieu of such accrued vacation time only to the extent required by applicable state law.

Benefits that arose prior to the Petition Date. The Employee Benefits that the Debtors seek authority to pay are generally described below.

(i) *Health Insurance*

91. The Debtors offer a fully-insured health plan for certain employees and a self-insured health plan for others, depending on their location (collectively, the "Health Plans").[26] Employees contribute to the cost of such Health Plans through direct payroll deductions that range from $21.00 to $277.00 per pay period depending upon various factors, including the plan selected and dependents covered. The aggregate average monthly cost of the Health Plans is approximately $475,000, of which approximately $390,000 is paid by the Debtors. In addition to the average monthly cost of the Health Plans, the Debtors also pay an administrative fee for the self-insured health plan, which is approximately $15,000 per quarter. The Debtors believe that they are current on all payments related to the Health Plans; however, to the extent that any amounts remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtors seek to be authorized, but not directed, to pay such amounts.

(ii) *Dental Coverage*

92. The Debtors offer a fully-insured dental plan for certain employees and a self-insured dental plan for others, depending on their location (collectively, the "Dental Plans"). Employees contribute to the cost of such Dental Plans through direct payroll deductions that range from $6.00 to $37.00 per pay period depending upon various factors, including the plan selected and dependents covered, and the remainder is paid by the Debtors. The average monthly cost of such Dental Plans is approximately $24,000, of which approximately $1,000 is

---

[26]  As a component of the self-insured health plan, the Debtors also maintain stop-loss coverage that limits liability to a maximum of $100,000 per insured and $3,215,000 in the aggregate.

paid by the Debtors. In addition to the average monthly cost of the Dental Plans, the Debtors also pay an administrative fee for the self-insured dental plan, which is approximately $2,200 per month. The Debtors believe that they are current on all payments related to the Dental Plans; however, to the extent that any amounts remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtors seek to be authorized, but not directed, to pay such amounts.

(iii)     *Miscellaneous Benefits*

93.     The Debtors offer life insurance, short-term/long-term disability, flexible spending, vision insurance plans and payment of union dues (the "Miscellaneous Benefits") to or on behalf of certain of their employees.[27] The average monthly amount of the Miscellaneous Benefits paid by the Debtors is approximately $35,000. As of the Petition Date, the Debtors estimate that accrued but unpaid amounts on account of the Miscellaneous Benefits is approximately $10,000 in the aggregate. The Debtors respectfully request the authority to pay accrued but unpaid Miscellaneous Benefits in the ordinary course of business.

(iv)     *Retirement Benefits*

94.     The Debtors offer certain employees savings and retirement plans through which they can accumulate savings for their retirement, including a 401(k) retirement savings plan (the "401(k) Plan"). The Debtors provide a matching contribution to the 401(k) Plan and

---

[27]     Additionally, the American Recovery and Reinvestment Act of 2009 (the "ARRA") provides for an employer subsidy of COBRA premiums for involuntarily terminated employees. Under the ARRA, an employee who becomes eligible for COBRA between September 1, 2008 and December 31, 2009 due to a covered employee's involuntary termination of employment will only be required to pay 35 percent of his or her COBRA premium. The remaining 65 percent of the COBRA premium will be paid for by the employer and then reimbursed by means of a payroll tax credit to the employer. As of the Petition Date, approximately 31 of the Debtors' former employees have either elected or are eligible to elect COBRA and may be eligible for employer subsidized COBRA under the ARRA. The Debtors believe that they are current on all obligations related to COBRA premiums subsidies for eligible individuals under the ARRA; however, to the extent that any premiums subsidies remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtors seek to be authorized, but not directed, to pay such amounts.

35

the total monthly average cost of such matching contribution is $18,000. The Debtors seek authority in the Employee Motion to pay all amounts related to the 401(k) Plan as they become due in the ordinary course of business and to satisfy any amounts that arose prior to the Petition Date.

(v)     *Tuition Reimbursement*

95.     The Debtors provide their employees with an educational reimbursement program (the "Educational Reimbursement Program") whereby the Debtors reimburse employees for the cost of tuition for various educational programs and degrees, including degree conferring college programs. The annual cost to the Debtors for the Educational Reimbursement Program is approximately $8,000. By the Employee Motion, the Debtors seek authority to pay all amounts related to the Educational Reimbursement Program as they become due in the ordinary course of business and to satisfy any amounts that arose prior to the Petition Date.

**c.     Administrative Service Obligations**

96.     As is customary in the case of most large companies in the ordinary course of their businesses, the Debtors use third parties to administer Employee Benefits, the 401(k) Plan, workers' compensation and payroll services (the "Administrative Service Providers"). The Debtors estimate that the average monthly cost of the Administrative Service Providers' services is approximately $29,000 in the aggregate.[28] The continued support of the Administrative Service Providers is crucial to the Debtors' ability to maintain accurate and meaningful books and records, including, but not limited to, books and records reflecting the Debtors' employee benefit and payroll obligations. The Debtors believe that they are current on all Administrative Service Obligations; however, to the extent that any premiums remain unpaid as of the Petition

---

[28]     This amount does not include the administrative fees previously included with the Health Plans and the Dental Plans.

Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtors seek to be authorized, but not directed, to pay such Administrative Service Obligations. The Debtors also seek authority to continue to pay any Administrative Service Obligations that arise postpetition in the ordinary course of business.

### d. Miscellaneous Expenses

97. The Debtors may determine that there are additional de minimis prepetition obligations that have not been identified in the Employee Motion. The Debtors, however, may only learn of such amounts subsequent to the date hereof. Accordingly, the Debtors request authority to pay any such additional obligations relating to the Miscellaneous Expenses up to an aggregate amount of $75,000 upon five business days' prior written notice to counsel to the First Lien Agent, counsel to any statutory creditors' committee appointed in these chapter 11 cases and the Office of the U.S. Trustee, setting forth the nature and amount of the additional obligation sought to be paid. If an objection is interposed within such five-day period, the Debtors will be required to seek authority from this Court to make such payment.

### e. Workers' Compensation Obligations

98. In the ordinary course of business, the Debtors maintain workers' compensation coverage under which they are liable to current and former employees. The Debtors purchase a fully-insured, premium-based workers' compensation insurance policy from CNA National Fire Insurance Company of Hartford for which the Debtors pay an average monthly cost of $45,000. As of the Petition Date, the Debtors believe they are current with respect to such premiums; however, to the extent that any premiums remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtors seek to be authorized, but not directed, to pay such amounts.

99.     In some states, if the Debtors fail to pay the Workers' Compensation Obligations in a timely manner, then the applicable state agency may intervene, pay the Workers' Compensation Obligation, and assert a priority claim against the Debtors for reimbursement, penalties and/or assessments. In addition, some applicable state agencies may challenge the Debtors' authority to continue to do business for failure to remain current on workers' compensation claims.

### f.     Withholdings and Deductions from Employee Paychecks

100.    The Debtors deduct certain amounts from their employees' paychecks for the payment of the employee portion of health and welfare insurance premiums, 401(k) deductions and other miscellaneous amounts (collectively, the "Employee Deductions"). The Employee Deductions comprise property of the employees. The Employee Deductions are forwarded by the Debtors to appropriate third-party recipients at varying times.

101.    The Debtors also may be in possession of various other withholdings, such as payroll taxes, social security, garnishments, child support payments, etc. (together with the Employee Deductions, the "Deductions"). It is likely that funds have been deducted from employee wages but have not yet been forwarded to the appropriate third-party recipients. Deductions total approximately $625,000 per pay period. The Debtors seek authority to forward the Deductions to the appropriate parties.[29]

102.    Absent prompt payment of amounts owed in connection with the Prepetition Employee Obligations, it is likely that employee morale and support will be impaired. As many of the Debtors' employees rely on the timely receipt of their paychecks and/or reimbursement for expenses, any delay in paying amounts owed in respect of the

---

[29]     In the event the Court is not prepared to grant this relief requested in the Employee Motion, the Debtors reserve the right to assert and establish that such funds have been held in constructive trust.

Prepetition Employee Obligations could cause such employees serious hardship. Any such deterioration in employee morale and welfare at this critical time may have a devastating impact on the value of the Debtors' assets and businesses.

103. Many employees simply live from paycheck to paycheck and rely exclusively on receiving their full compensation to pay their daily living expenses. Furthermore, many employees rely on their Employee Benefits, such as Health Benefits, without which they would be forced to pay for or go without insurance coverage for themselves and their families. As a result, these employees will be exposed to significant financial and health related problems if the Debtors are not permitted to honor the unpaid Prepetition Employee Obligations. If these employees fail to remain fully motivated as a consequence of not receiving the compensation set forth in the Employee Motion, the Debtors' ability to maintain and preserve the value of their estates may be forever lost.

104. Amounts withheld by the Debtors from the employees' paychecks represent, in many cases, employee earnings specifically designated by employees or, in the case of garnishments, by judicial authorities, to be deducted from employee paychecks and paid accordingly. The failure to make these payments will result in hardship to certain employees or other third parties. The Debtors expect to be inundated with inquiries from garnishors and other designated recipients regarding the Debtors' failure to submit, among other things, taxes, child support and alimony payments which are not the Debtors' property, but rather have been withheld from employee paychecks. Moreover, if the Debtors are unable to remit certain of these amounts, the employees could face legal action and/or imprisonment.

105. The Debtors' employees are an essential component of a successful reorganization. Any deterioration in employee morale and welfare at this critical time

undoubtedly would have a devastating impact on the Debtors, the value of their assets and businesses, and ultimately, the Debtors' ability to reorganize. Accordingly, the relief sought in the Employee Motion is in the best interests of the Debtors' estates and creditors, and will allow the Debtors to continue to operate their businesses with minimal disruption and proceed with the important task of stabilizing their operations.

106.    The Debtors' business operations are heavily dependent upon their employees. If the Debtors are unable to immediately pay Prepetition Employee Obligations and provide the Employee Benefits, the Debtors' ability to run their businesses will be placed in jeopardy. Accordingly, the Debtors submit that the relief requested in the Employee Motion is necessary to avoid immediate and irreparable harm.

I.    **Debtors' Motion for an Order Authorizing Payment of Prepetition Taxes and Fees to Taxing and Regulating Authorities and Granting Related Relief (the "Taxes and Fees Motion")**

107.    In the ordinary course of their businesses, the Debtors incur and remit taxes[30] and fees to federal, state and local taxing and regulating authorities including, but not limited to, gaming and racing taxes and fees, hotel taxes, sales and use taxes and "winnings" taxes (collectively, the "Taxes and Fees"). The Debtors pay the Taxes and Fees to the applicable authorities (the "Taxing and Regulating Authorities"), including those Taxing and Regulating Authorities on Exhibit A annexed to the Taxes and Fees Motion,[31] on a periodic basis as required by statute and regulation.

---

[30]    In addition, the Debtors remit taxes to the applicable federal, state and local taxing authorities related to amounts that they are required to withhold from employees' wages including income taxes and social security taxes (the "Withholdings Taxes"). Remittance of the Withholdings Taxes is addressed in the Employee Motion, filed concurrently herewith.

[31]    The Debtors believe that the list of Taxing and Regulating Authorities on Exhibit A to the Taxes and Fees Motion is complete, but request that the relief sought in the Motion also be applicable to all Taxing and Regulating Authorities to which the Debtors remit Taxes and Fees and not be limited exclusively to those Taxing and Regulating Authorities listed on Exhibit A to the Taxes and Fees Motion.

108.    The process by which the Debtors remit the Taxes and Fees varies depending on the nature of the Taxes and Fees at issue and the applicable Taxing and Regulating Authority that is being paid. Furthermore, there is often a lag-time between when the Debtors incur obligations to pay the Taxes and Fees and the date on which the Taxes and Fees are actually remitted. Various governmental units may therefore have claims against the Debtors for Taxes and Fees that have accrued but are unpaid and/or not yet due as of the Petition Date. The Debtors estimate that approximately $4.8 million of unpaid but accrued Taxes and Fees in the aggregate may be owing as of the Petition Date. If paid when due in the ordinary course, the Debtors estimate that the majority of all amounts owing on account of Taxes and Fees will be paid out over the following two week period.

109.    By the Taxes and Fees Motion, the Debtors seek entry of an order authorizing the Debtors to pay, in the ordinary course when due and without acceleration, the Taxes and Fees (including any penalties and interest thereon) that have arisen prior to the Petition Date, including all Taxes and Fees subsequently determined upon audit, or otherwise, to be owed for periods prior to the Petition Date.

110.    In addition, prior to the Petition Date, certain Taxing and Regulating Authorities were sent checks or received wires in respect of Taxes and Fees that may not yet have cleared the Debtors' Banks. To the extent any check or wire has not yet cleared the Banks, the Debtors further request that the Court authorize the Banks to receive, process, honor and pay such checks or wires if and to the extent the Debtors request the same. Consistent with the foregoing, to the extent the Taxing and Regulating Authorities have not otherwise received payment for all prepetition Taxes and Fees owed, the Debtors seek authorization to issue

replacement checks or provide for other means of payment to the Taxing and Regulating Authorities, to the extent necessary to pay all outstanding prepetition Taxes and Fees.

### 1. Gaming Taxes & Fees

111. In connection with the Debtors' gaming operations, the Debtors are required to remit certain taxes and pay certain fees and assessments to state, county and local Taxing and Regulating Authorities (the "Gaming Taxes & Fees"),[32] based upon the adjusted gross revenue derived from the Debtors' casino operations and, in Colorado, based upon the number of gaming machines, to maintain their gaming licenses and to operate their gaming facilities. For example, in order to maintain its gaming license for the slot machines at Hoosier Park, in addition to the daily deposit of certain Gaming Taxes & Fees, the Debtors must distribute, on the fifteenth day of each month, an amount equal to fifteen percent (15%) of the adjusted gross receipts from its slot machines for the previous month. Such distributions are (i) made to the Indiana Horse Racing Commission, (ii) made to different horsemen-related funds and associations and (iii) held by the Debtors for payment of future purse liabilities to owners of winning horses at races at Hoosier Park;[33] all in order to provide for the "gaming integrity fund, horse racing purses, and to horsemen's associations." See Ind. Code § 4-35-7-12. The Debtors believe approximately $3.75 million in Gaming Taxes & Fees is due and owing for the period prior to the Petition Date.

---

[32] For the avoidance of doubt, the Gaming Taxes and Fees include all taxes, fees, assessments and any similar payments due by any of the Debtors to a federal, state, county or municipal authority related to its license and/or continued ability to offer gaming operations at any of its properties.

[33] Fifty-three percent (53%) of the fifteen percent (15%) of the adjusted gross receipts from Hoosier Park's slot machines for the previous month are held by the Debtors on behalf of the horsemen as future purse liabilities.

## 2. Racing Taxes & Fees

112. In connection with the Debtors' horse racing operations, the Debtors are required to remit taxes, fees and assessments (the "Racing Taxes & Fees"),[34] the payment of which determines their license and ability to host horse races at Hoosier Park and accept wagers on horse races at Hoosier Park and the OTB Facilities. The failure to timely remit such Racing Taxes and Fees would disrupt and potentially preclude Hoosier Park and the OTB Facilities from being able to accept wagers on horse races. For instance, the Debtors are assessed a pari-mutuel tax, which is a fixed percentage of the "mutuel pool" (i.e. the total pool of wagers collected on a race from which payouts and purse funds are calculated), that must be remitted to the applicable Taxing and Regulating Authorities based on wagers collected at Hoosier Park and the OTB Facilities. The Debtors believe approximately $875,000 in Racing Taxes and Fees is due and owing for the prepetition period.

## 3. Hotel Taxes

113. The Debtors operate a hotel at Fortune Valley and charge fees to patrons and customers who rent rooms to stay at the hotel, and a tax is assessed on revenue from such room rentals (the "Hotel Taxes"). The Debtors believe that, as of the Petition Date, approximately $2,300 in Hotel Taxes is due and owing.

## 4. Sales & Use Taxes

114. In the ordinary course of their businesses, the Debtors engage in sales of merchandise, food and liquor at their hotel, restaurants and bars. In connection therewith, to the extent required under applicable state law, the Debtors collect sales taxes (the "Sales Taxes")

---

34 For the avoidance of doubt, the Racing Taxes and Fees include all taxes, fees, assessments and any similar such payments due by any of the Debtors to a federal, state, county or municipal authority related to its license and/or continued ability to offer racing operations at Hoosier Park and/or its ability to collect wagers at any of the OTB Facilities.

43

·

from their customers. The Debtors then remit the Sales Taxes to the relevant Taxing and Regulating Authorities based on the Sales Taxes actually collected from customers during a specified period. The Debtors also pay use taxes in connection with their purchases of tangible personal property and/or services for use in jurisdictions where the acquisition of such property is taxable, but the vendor did not charge sales tax because the vendor is not obligated to charge or remit sales taxes to its home state for sales to a Debtor (the "Use Taxes"). The Debtors believe that, as of the Petition Date, approximately $85,000 in Sales and Use Taxes is due and owing.

     5.    **Winnings Taxes**

     115.    The Internal Revenue Service as well as a few state departments of revenue require the Debtors to withhold certain amounts from the gambling and racing-wager winnings of their patrons once the winnings reach a specified amount (the "Winnings Taxes"). See, e.g., I.R.S. Form W-2G. The specified amount of Winnings Taxes varies with each Taxing and Regulating Authority. When a customer's gambling winnings and racing-wagers reach applicable thresholds, the Debtors withhold the percentage required by each state and federal Taxing and Regulating Authority and process a tax form for the applicable Taxing and Regulating Authority. The frequency for remitting payments to each Taxing and Regulating Authority ranges from weekly to monthly depending on the jurisdiction. The Debtors believe that, as of the Petition Date, approximately $32,000 in Winnings Taxes is due and owing.

     116.    The Debtors seek to pay prepetition Taxes and Fees to, among other things, discourage the Taxing and Regulating Authorities from taking actions that may interfere with the Debtors' continued, uninterrupted operations and successful reorganization. Nonpayment of these obligations may cause the Taxing and Regulating Authorities to take actions such as, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, pursuing payment of certain of the Taxes and Fees from the

Debtors' directors, officers and other employees and seeking to lift the automatic stay, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates. Additionally, the Debtors' failure to pay certain Taxes and Fees could cause some states to challenge the Debtors' right to operate within their jurisdiction. Such a challenge would place an administrative burden on the Debtors' management and divert management's attention from the reorganization process.

117.    To the extent that certain of the Taxes and Fees are collected but not remitted by the Debtors, the Debtors' officers, directors and other employees may be personally liable and subject to lawsuits during the pendency of these chapter 11 cases. The threat of a lawsuit, and any ensuing prosecution, would distract the Debtors and their personnel from important tasks, to the detriment of all parties in interest. Accordingly, the Debtors submit that the proposed relief is in the best interests of the Debtors' estates.

118.    The Debtors' business operations rely heavily on their compliance with applicable federal, state and local law. If the Debtors are unable to immediately comply with the requirements of the applicable Taxing and Regulating Authorities, the Debtors' ability to conduct business in the various jurisdictions within which they operate will be placed in jeopardy. Accordingly, the Debtors submit that the relief requested in the Taxes and Fees Motion is necessary to avoid immediate and irreparable harm.

J.    **Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service to the Debtors, (II) Deeming Utility Companies Adequately Assured of Future Payments and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion")**

119.    By the Utilities Motion, the Debtors seek entry of interim and final orders (i) prohibiting utility companies (collectively, the "Utility Companies" and each, individually, a "Utility Company") from altering, refusing or discontinuing service to the Debtors,

(ii) deeming the Utility Companies adequately assured of future payment and (iii) establishing procedures for determining requests for additional adequate assurance.

120.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, telephone, natural gas, sewage, cable, internet and similar services (collectively, the "Utility Services") from a number of different Utility Companies. A list identifying all or substantially all of the Utility Companies providing services to the Debtors is attached as an exhibit to the Utilities Motion.

121.    Historically, the Debtors have paid all amounts owing to the Utility Companies on a timely basis. To the best of the Debtors' knowledge, the Debtors are current with respect to all of their undisputed invoices for Utility Services, except where the commencement of these chapter 11 cases may have interrupted some of these payments. Prior to the Petition Date, the average aggregate monthly cost of Utility Services for all of the Debtors was approximately $272,000.

122.    The Debtors operate a hotel, casino, horse racing track and three OTB Facilities that each require uninterrupted Utility Services to run successfully. Thus, if the Utility Companies are permitted to terminate Utility Services, the Debtors' operations will be irreparably harmed and their ability to reorganize jeopardized. Accordingly, to avert a potentially disastrous situation and, ultimately, the demise of their businesses, the Debtors have sought the relief requested in the Utilities Motion.

123.    It is essential that the Utility Services continue uninterrupted. If the Utility Companies are permitted to alter, refuse or discontinue Utility Services, the Debtors' operations will be impaired and may be forced to shut down.

124.    To provide adequate assurance of payment for future services to the

Utility Companies, the Debtors propose to place deposits ("Utility Deposits") with certain of the

Utility Companies so that the total amount on deposit at each such Utility Company, after taking

into account the amount of prepetition debt that may be recovered or set off against any

prepetition deposit pursuant to section 366(c)(4) of the Bankruptcy Code, equals 50% of the

Debtors' estimated cost of monthly utility consumption for each such Utility Company. The

aggregate amount of all such deposits for the Utility Companies listed on an exhibit attached to

the Utilities Motion would be approximately $136,000. The Debtors propose that the Utility

Deposits be made within fifteen days after the entry of an order granting the Utilities Motion.

125.    In addition, by the Utilities Motion, the Debtors seek to establish

reasonable procedures by which a Utility Company may request additional adequate assurance of

future payment, in the event that such Utility Company believes that the assurance of future

payment proposed by the Debtors is insufficient.

K.    **Debtors' Motion for Entry of an Order (I) Authorizing Debtors to
(A) Maintain Insurance Programs, (B) Maintain Insurance Premium
Financing Program, (C) Pay Insurance Premiums in the Ordinary Course
and (D) Pay All Obligations Associated Therewith; and (II) Preventing
Insurance Companies from Giving Any Notice of Termination or Otherwise
Modifying Any Insurance Policy Without Obtaining Relief from the
Automatic Stay (the "Insurance Motion")**

126.    In the ordinary course of business, the Debtors maintain a property and

casualty insurance program pursuant to which the Debtors procure numerous insurance policies

(each, as may be revised, extended, supplemented, renewed or changed, an "Insurance Policy",

and collectively, the "Insurance Policies"). The Debtors maintain the Insurance Policies in

amounts and types of coverage in accordance with laws governing the multiple jurisdictions in

which the Debtors do business, as well as in accordance with their numerous contractual

obligations. The Insurance Policies provide coverage for, among other things, property,

commercial general liability, automobile and garagekeepers, participant accident, excess liability, criminal liability, employment practices and fiduciary liability, and directors and officers liability.[35]

127.     The annual premiums under the Debtors' Insurance Policies for the 2010 policy period are approximately $1,200,000 in the aggregate. The current carriers of the Insurance Policies (as may be revised, extended, supplemented, renewed or changed, the "Insurance Carriers") are set forth in an exhibit to the Insurance Motion, along with the corresponding type of coverage and individual annual premiums.

1.     **Policies With Financed Premiums**

128.     Certain of the Debtors' insurance premiums are financed pursuant to premium finance agreements (the "Premium Finance Agreements") between Centaur, Inc., as named insured, and AFCO Credit Corporation, as lender ("AFCO").[36] Under the Premium Finance Agreements, Centaur, Inc. through Centaur, LLC pays an initial down payment and monthly installments thereafter to AFCO in exchange for AFCO's agreement to pay the full annual insurance premium, in advance, to the respective insurers. The aggregate amount of the annual premiums under the three Insurance Policies currently covered by the Premium Finance Agreements for the 2010 policy period equals approximately $200,000. Under the Premium Finance Agreements, Centaur, Inc., through Centaur, LLC, made a down payment of $17,011 and, after assessment of a $7,993 finance charge, financed a total of $187,111. The financed

---

[35]     In addition to the Insurance Policies, the Debtors maintain several other insurance policies and programs with respect to employee benefits, including health, dental, disability, life insurance and workers' compensation. These programs and policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' employee wage policies and benefit programs.

[36]     The financed Insurance Policies provide directors and officers insurance and employment practices liability insurance for both the Debtors and Centaur, Inc. Although Centaur, Inc. is the named insured for the financed Insurance Policies, the down payment and monthly installments for such policies have traditionally been allocated to Centaur, LLC on the basis that the operations of Centaur, LLC and its subsidiaries comprise 100% of the Company's business.

amount is payable in eleven monthly installments of $17,011, due on the twenty-fourth day of each month. As of the Petition Date, the Debtors estimate that $153,089 of the financed amount remains to be paid to AFCO on account of the financed Insurance Policies for the 2010 policy period.

129. The obligations under the Premium Finance Agreements are secured by all unearned premiums or dividends payable to the Debtors under the Insurance Policies covered by the Premium Finance Agreements, and loss payments that reduced unearned premiums. Under the Premium Finance Agreements, AFCO is appointed as Centaur, Inc.'s attorney in fact with authority to, among other things, cancel the Insurance Policies in the event of non-payment.

## 2. Policies Without Financed Premiums

130. The Debtors do not finance the premiums payable under their remaining eleven Insurance Policies. As of the Petition Date, the Debtors estimate that approximately $700,000 in premiums remain unpaid on account of these unfinanced Insurance Policies for the 2010 policy period.

131. Although the Debtors believe that they are current on their prepetition premiums with respect to the Insurance Policies, by the Insurance Motion, pursuant to sections 105, 362 and 363 of the Bankruptcy Code and the Operating Guidelines for Chapter 11 Cases established by the U.S. Trustee (the "UST Guidelines"), the Debtors respectfully request authorization to (i) maintain insurance coverage levels required under their property and casualty insurance program, including authority to revise, extend, supplement, renew or change insurance coverage as needed, (ii) maintain their premium finance program including authority to renew, supplement or enter new financing arrangements as needed and (iii) pay any prepetition and postpetition obligations associated therewith.

132.     As of the Petition Date, the Debtors estimate that an aggregate amount of approximately $850,000 in premiums is owing under the property and casualty insurance program for the remainder of the current policy period, on account of either the Premium Finance Agreements or annual premiums for Insurance Policies not financed under the Premium Finance Agreements. The Debtors seek authority to pay all premiums and other amounts due and owing or accrued as of the Petition Date with respect to the Insurance Policies and the Premium Finance Agreements, including payments to premium finance companies and insurance brokers in connection with postpetition services rendered, in an amount not to exceed $900,000 without further order of this Court and without prejudice to the Debtors' right to seek further relief from the Court increasing this amount.

133.     In addition, by the Insurance Motion, the Debtors respectfully request an order preventing Insurance Carriers from giving any notice of termination or otherwise modifying or cancelling any Insurance Policies without obtaining relief from the automatic stay.

134.     It is critical that the Debtors maintain their Insurance Policies in order to provide a comprehensive range of coverage that protects their businesses and their properties. Significantly, the Debtors' Insurance Policies provide coverage of their property and assets in certain "force majeure" types of events. Without such coverage, the Debtors would incur substantial costs associated with repairing the damage caused by such events. The Debtors' current coverage also is necessary to replace loss of business income after the occurrence of a major loss event that involves any type of business interruption. As noted above, many of the coverage requirements are mandated by law or by the contracts governing the Debtors' commercial activities. If these policies were allowed to lapse, or if the Insurance Carriers were

able to obtain relief to cancel the policies, the Debtors would be exposed to substantial liability for any damages resulting to persons and property of the Debtors and others.

135.     Further, if the Debtors are unable to pay the premiums necessary to maintain the Insurance Policies, they may be unable to find alternative insurance carriers willing to offer them similar insurance at a competitive price. While the Debtors question the right of any insurer to terminate the Insurance Policies for non-payment of premiums, any litigation associated with such alleged termination would be contested, and thus, very costly to the Debtors' estates.

136.     It is also necessary that the Debtors receive authorization to continue to pay the monthly installments for those Insurance Policies that are financed through Premium Finance Agreements and under which they are insured. Although Centaur, Inc. is the named insured under the Premium Finance Agreements and the underlying financed Insurance Policies, the operations of Centaur, LLC and its subsidiaries comprise 100% of the Company's business. If Centaur, Inc. fails to pay such monthly installments, the financed Insurance Policies may lapse or AFCO may be able to obtain relief to or otherwise cancel such policies, and the Debtors – not just Centaur, Inc. – may be faced with the consequences described above, including exposure to substantial liability related to employee practices and increased premiums. If the financed Insurance Policies lapse or are otherwise cancelled, the Debtors may also be unable to obtain the alternate insurance coverage that, I have been advised they would need to comply with the UST Guidelines, in sufficient time or in a cost effective manner. Additionally, the maintenance of the Debtors' directors and officers insurance policies is necessary to retain the Debtors' senior management who are critical to the success of the Debtors' business and reorganization.

137.    Prepetition premiums or other amounts due and owing on the Insurance Policies and Premium Finance Agreements are minimal compared with the potential risk to the value of the Debtors' estates absent insurance coverage.  Based upon the foregoing, the relief requested in the Insurance Motion is amply justified.

138.    Maintaining the Debtors' Insurance Policies and the Premium Finance Agreements, paying any obligations associated therewith and preventing cancellation of the Insurance Policies in the absence of stay relief are critically important to prevent irreparable damage to the Debtors' estates and necessary in the exercise of the Debtors' duties to safeguard, preserve and maintain their estates for the benefit of creditors.  Accordingly, the Debtors submit that the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm.

L.    **Debtors' Motion for an Order Authorizing the Debtors to Pay Prepetition Claims of Certain Essential Suppliers (the "Essential Supplier Motion")**

139.    By the Essential Supplier Motion, the Debtors seek entry of an order, pursuant to sections 105(a) and 363 of Bankruptcy Code, (i) authorizing, but not directing, the Debtors to pay the prepetition claims (collectively, the "Essential Supplier Claims") of certain parties who supply goods or services critical to the continued operation of the Debtors' businesses (collectively, the "Essential Suppliers"), and (ii) granting certain related relief.

140.    The preservation and maximization of the going concern value of the Debtors' businesses, including the preservation of key business relationships, are among management's primary goals as the Debtors transition into chapter 11.  For this reason, the Debtors seek to minimize any adverse business effects of their chapter 11 filing to the fullest extent possible by obtaining authority to pay the Essential Suppliers because they are of paramount importance to the Debtors' business operations.

141.     The Debtors are leading domestic horse racing, OTB and casino operators. The majority of the Debtors' wagering revenue is from mutuel commissions[37] generated through wagers placed at either Hoosier Park or one of the OTB Facilities on races that take place throughout the United States and are displayed in the Debtors' facilities via simulcast. In 2009, the Debtors generated a total of $16.9 million in mutuel commissions of which $15.8 million was attributable to wagers placed on races displayed via simulcast. Only $1.1 million of the Debtors' mutuel commission was generated through wagers placed on live races at Hoosier Park. All but one of the Essential Suppliers provide materials and services essential to the Debtors' ability to promote and accept wagering on races taking place at tracks other than Hoosier Park which are displayed via simulcasting, without which the Debtors would be unable to maintain an uninterrupted supply of quality products and services to their customers, resulting in direct detriment to the Debtors' estates. Due to the nature of the Debtors' businesses, continuing their relationships with their Essential Suppliers is critical to the Debtors' ongoing relationships with their customers.

142.     The sole remaining Essential Supplier provides marketing and direct mailing services that are critical to the Debtors' customer programs.[38] This Essential Supplier provides data processing, mail streaming, letter-shop operations and variable printing. The Debtors utilize this Essential Supplier to deliver over $3,000,000 in cash offers each month to their customers. These offers are typically tailored to particular subsets of the Debtors'

---

[37]     The Debtors use a betting system commonly referred to as "mutuel betting." In mutuel betting, for each race, there is a betting pool comprised of all of the wagers for that particular race. Those who bet on the competitors finishing in the first three places share the total amount from the betting pool. Before any amounts are paid out from the betting pool, a percentage of the total betting pool is paid to the wagering company as a commission and is referred to as the "mutuel commission."

[38]     The Debtors have filed a separate motion contemporaneously herewith pertaining to their customer programs.

customers, and thus, must be carefully "associated" by the Essential Supplier based on instructions received from the Debtors. A single error in association that results in an offer being extended to the wrong subset of customers or a larger subset of customers than intended could result in hundreds of thousand or even millions of dollars of lost revenue if the Debtors are called upon to honor an offer made by mistake. Due to the liability involved with the unique process of sending out cash offers in the mail and the strict guidelines outlined in the Debtors' state-approved internal controls regarding this process, it is critical that the Debtors work with a confidential and expert vendor that has been qualified by the Debtors. While many mail-houses and letter-shops can provide mail streaming and variable printing, the data processing and offer association required by the Debtors dictates that they utilize only direct mail production companies that exercise the most stringent mail processing standards and controls. The Essential Supplier's quality control systems are superior and have allowed it to provide error-free service to the Debtors since the opening of Hoosier Park. In the event the Debtors were forced to switch to an alternative provider, several weeks and even months would be lost to the process of scrutinizing that vendor's processes to ensure the requisite level of service is provided.

143. The majority of the Essential Suppliers comprise the exclusive source of goods or services meeting the Debtors', and ultimately the Debtors' customers', needs with respect to simulcasting of non-Hoosier Park races and wagering on such races. These goods or services are essential for the Debtors to continue to provide the level of service their customers expect. Because the Debtors do not have any viable alternatives to obtain substitute goods or services from other vendors or providers, the Debtors have determined that they must have the authority to satisfy certain prepetition claims of these Essential Suppliers to ensure that these goods and services will continue to be available to the Debtors without interruption.

144.     The Debtors are placing great emphasis on avoiding disruptions to their operations in the opening days of their chapter 11 cases. The Debtors believe that certain of their vendors and service providers will make credible (though actionable) threats that, unless paid on account of their prepetition debt, they will cease to supply the Debtors with specific goods and services necessary to maintain the smooth operation of the Debtors' businesses. The Debtors seek to avoid such disruptions to their operations by identifying those vendors and service providers that would have the ability, as well as the willingness, to interrupt their operations at Hoosier Park or the OTB Facilities.

145.     Disruption of the Debtors' ability to provide wagering capabilities on simulcast races to their customers will undermine customer relationships and force customers to visit the Debtors' market competitor as they seek to place wagers on such races elsewhere as a result of the Debtors' non-delivery of such services. Given the customized nature of the Debtors' industry, any disruption in the Debtors' business relations will result in substantial and irreparable harm to the Debtors' businesses and reorganization efforts. Likewise, disruption of the Debtors' direct mail marketing as a result of the Debtors' inability to efficiently and properly administer those programs would likely result in diminished revenues and goodwill.

146.     Given the importance of simulcast-generated wagering and mutuel commissions and the Debtors' direct mail marketing efforts to their daily operations and revenue streams, even the slightest delay in receiving goods and services from any Essential Suppliers could cause a substantial disruption to the Debtors' operations, limit the wagering capabilities of the Debtors' customers, and damage the Debtors' business reputation and undermine the Debtors' ability to generate ongoing operating revenue. Even if suitable alternative suppliers were available, the time necessary to identify these replacement suppliers and integrate them into

the Debtors' operations would cause a significant disruption to the Debtors' wagering capabilities in the short term which would likely have significant long term effects. Accordingly, it is imperative that the Debtors be authorized to pay the Essential Supplier Claims to (a) ensure that the essential goods and services provided by the Essential Suppliers are available to the Debtors without interruption, and (b) preserve to the fullest extent possible the value of the Debtors' businesses for the benefit of all stakeholders.

147.    The Debtors estimate that the aggregate amount of the accrued and outstanding Essential Supplier Claims is $120,000 with no one Essential Supplier owed more than approximately $55,000.

148.    The relief sought in the Essential Supplier Motion plainly is essential to the Debtors' reorganization. The Debtors operate in the highly competitive racing and gambling segment, specifically in that the Debtors' competing racetrack, Indiana Downs, provides a nearby alternative for the Debtors' customers. Room for error in this environment is essentially non-existent. Quite simply, in the wake of the unavoidable negative publicity attending the filing of these chapter 11 cases, the Debtors cannot afford any material disruptions of their business operations or present anything less than a "business as usual" appearance to their customer base and to the public.

149.    The Debtors and their advisors have completed a thorough analysis of the Debtors' vendors to identify the Essential Suppliers, those critical to the Debtors' ongoing operations. In conducting this analysis, the Debtors reviewed their master vendor files and open accounts payable systems to identify those vendors that provide goods or services essential to the Debtors' operations and that may refuse or be unable to supply or service the Debtors absent payment of their prepetition claims. The Debtors also evaluated the potential disruptions to their

operations resulting from an Essential Supplier's refusal to supply, including the likelihood that the Debtors could replace or re-source the vendor in a timely manner without significant disruption to their operations.

150.   The Debtors have exercised high levels of care in reviewing the facts and circumstances of their Essential Suppliers and propose to pay only those vendors and providers that they believe could cause material and potentially irreparable disruptions to the Debtors' operations if the relief sought in the Essential Supplier Motion is not granted. Moreover, as a quid pro quo for, and as a condition to, the payment of the Essential Supplier Claims, the Debtors intend to require postpetition commitments from Essential Suppliers to provide the Debtors with goods or services on credit, pricing or payment terms and order limits that are equal to, or better than, those provided to the Debtors prepetition (the "Trade Terms"). If an Essential Supplier accepts payment of its Essential Supplier Claim (an "Essential Supplier Payment") and fails thereafter to provide the Debtors with the agreed upon Trade Terms, then (a) any Essential Supplier Payment received by the Essential Supplier will be deemed an unauthorized postpetition transfer under section 549 of the Bankruptcy Code that the Debtors may either (i) recover from the Essential Supplier in cash or goods or (ii) at the Debtors' option, apply against any outstanding administrative claim held by such Essential Supplier; and (b) upon recovery of any Essential Supplier Payment, the corresponding prepetition claim of the Essential Supplier will be reinstated in the amount recovered by the Debtors, less the Debtors' reasonable costs to recover such amounts.

151.   Finally, although I have been advised that the refusal by an Essential Supplier to provide goods or services solely on account of its outstanding prepetition claim would likely constitute an actionable violation of the automatic stay, I have further been advised

that given that substantially all of the Essential Suppliers' individual claims are small in amount, it would be uneconomical for the Debtors to seek redress for any such violations from the Court.[39]

152.    Given the customized nature of their businesses and the demonstrated benefits to be obtained in exchange for any payments to the Essential Suppliers, the Debtors submit that the expenditure of estate funds proposed in the Essential Supplier Motion is minimal when compared to the value of their enterprise at risk, and represents a prudent course of action to ensure successful reorganization.

153.    The continuing, uninterrupted provision of goods and services by the Essential Suppliers is critically important to avoid irreparable harm to the Debtors' estates. The payment of the Essential Supplier Claims is necessary to prevent the immediate and irreparable damage to the Debtors' business operations (and customer confidence therein), going concern value and ability to reorganize that would result from the Debtors' inability to obtain indispensable goods and services.

**M.    Debtors' Emergency Motion for (I) Entry of Interim and Final Orders (A) Authorizing the Use of Prepetition Secured Parties' Cash Collateral, (B) Granting Adequate Protection and Related Relief, and (C) Modifying the Automatic Stay; and (II) Interim and Final Hearings (the "Cash Collateral Motion")**

154.    Prior to the commencement of these chapter 11 cases, the Debtors relied on proceeds of the First Lien Credit Facility and the Second Lien Credit Facility, and cash generated from day-to-day operations, to fund their operating expenses. The Debtors are currently negotiating with certain prepetition First Lien Lenders, but have not yet reached

---

[39]    Of the thirteen vendors identified by the Debtors as Essential Suppliers, only two have claims that exceed $5,300 in amount, and five have claims of $2,000 or less.

agreement on, the terms of a debtor in possession credit facility.[40] The Debtors will use the proceeds of the debtor in possession credit facility for, among other things, general corporate purposes and to make certain payments as adequate protection to the First Lien Secured Parties. The Debtors otherwise have and will generate sufficient cash to fund their operations during these chapter 11 cases.

155.    The Debtors have approximately $23 million (excluding cash in "restricted cash accounts") of cash on hand as of the Petition Date. This cash on hand, and revenues generated on a going forward basis, comprise cash collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral"). The Debtors need immediate use of Cash Collateral to satisfy payroll and pay vendors, meet overhead, pay utility expenses, as well as to make any other payments which are essential for the continued management, operation and preservation of the Debtors' businesses. The Debtors will be unable to continue their business operations absent immediate relief from the Court.

156.    The Debtors have negotiated the use of Cash Collateral with the First Lien Agent, and have obtained the First Lien Secured Parties' consent to the Debtors' use of Cash Collateral under the terms of the proposed interim order authorizing use of Cash Collateral (the "Proposed Interim Cash Collateral Order").[41] As adequate protection in respect of any diminution in value of the Collateral, the Debtors propose to provide the Prepetition Secured Parties with replacement liens on substantially all of the Debtors' prepetition and postpetition assets and property subject to certain excluded property (the "Postpetition Collateral"), and superpriority administrative expense claims. The Debtors will also pay the reasonable monthly

---

[40]      The Debtors expect to file a motion for approval of a debtor-in-possession financing facility (the "DIP Facility") so that a final hearing thereon can be held on or before March 31, 2010.

[41]      The Second Lien Secured Parties are deemed to have consented to the use of Cash Collateral pursuant to the terms of the Intercreditor Agreement.

fees and expenses of certain professionals retained by the First Lien Agent. Additionally, the use of Cash Collateral pursuant to the Proposed Interim Cash Collateral Order will be subject to a budget (subject to permitted variances), and the Debtors will provide the Prepetition Secured Parties and their financial advisors with on-going financial reporting to allow the Prepetition Secured Parties to monitor the Debtors' businesses and use of Cash Collateral.

157.    If the Debtors are unable to obtain approval of the use of Cash Collateral on an interim basis, their ability to consummate a rational restructuring of their liabilities, and to profitably operate their businesses pending consummation, will be jeopardized, reducing potential recoveries to all creditors. Entry of the Proposed Interim Cash Collateral Order, and, after the requisite notice and the final hearing, the final order authorizing use of Cash Collateral, is therefore (i) critical to the Debtors' ability to reorganize pursuant to the Bankruptcy Code, (ii) in the best interests of the Debtors and their estates, and (iii) necessary to avoid irreparable harm to the Debtors, their creditors and their assets, business, goodwill, reputation and employees.

Executed on March __, 2010

CENTAUR, LLC (for itself and on behalf of
its affiliated debtors and debtors in
possession)

By: _____
Kurt E. Wilson
Executive Vice President, Chief
Financial Officer, Treasurer and
Secretary of Centaur, LLC