-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **CENTAUR PA LAND, LP, *et al.*,** | : | **Case No. 09-13760 (KJC)** |
|  | : |  |
| Debtors. | : | **(Jointly Administered)** |
|  | : |  |
|  | : | **Objection Deadline: April 8, 2010 at 4:00 p.m.** |
|  | : | **Hearing Date: April 15, 2010 at 2:00 p.m.** |

-------------------------------------------------------------x

### MOTION OF WELLS FARGO BANK, N.A., AS AGENT, FOR THE ENTRY OF AN ORDER UNDER 11 U.S.C. § 1112(b) CONVERTING THE 2009 DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

Wells Fargo Bank, N.A., in its capacity as Administrative Agent and Collateral Agent for the Second Lien Lenders (defined below) (the "Movant"), by its undersigned counsel, submits this motion for the entry of an order pursuant to section 1112(b) of the United States Bankruptcy Code (the "Bankruptcy Code") converting the chapter 11 cases of Centaur PA Land LP ("Centaur PA") and Valley View Downs, LP ("VVD LP", and together with Centaur PA, the "2009 Debtors") to cases under chapter 7 of the Bankruptcy Code (the "Motion"), and in support thereof respectfully represents as follows:

### Preliminary Statement

1.     The 2009 Debtors are non-operating entities that allegedly hold a racing, gaming and entertainment development *opportunity* in Lawrence County, Pennsylvania that, if it is ever developed, will be known as "Valley View Downs." Unfortunately, the 2009 Debtors are in no position to avail themselves of that opportunity, and the costs of preserving the development of

Valley View Downs as an option is consistently and materially eroding creditor recoveries.[1]

2.  If the 2009 Debtors' cases are converted and the License Application (as defined below) is withdrawn, unsecured creditors of VVD LP would receive distributions of their pro rata share of approximately $50 million.[2] As every day goes by, however, the amount that could be available for distribution is being eroded by accruing administrative expenses. In addition, that value is now under direct attack from the 2009 Debtors' parent company (Centaur, LLC) and other affiliates (collectively, the "2010 Debtors"), who together with the First Lien Lenders (as defined below) are trying to access the value in VVD LP to subsidize the ongoing operations and administrative expenses of the 2010 Debtors (whose creditor body is dominated by the First Lien Lenders, and who have a very different agenda).

3.  Conversion of the 2009 Debtors' chapter 11 cases is warranted here because:

- The 2009 Debtors have no operations and no businesses. *See* November 9, 2009 Declaration of Kurt E. Wilson "In Support of Intercompany Financing Motion" ("Wilson Nov. Decl."), ¶¶ 8, 9 (D.I. No. 24);

- The 2009 Debtors continue to incur losses and unnecessary professional fees and other administrative liabilities;[3]

- The sale or other disposition of the 2009 Debtors has been contemplated since at least September 17, 2008 (*see* ¶¶ 13 - 16, infra);

- The 2009 Debtors cannot be rehabilitated. Among other things, it is estimated that not less than $176 million[4] is required to construct the

---

[1]  As more fully discussed below, even if the 2009 Debtors could obtain the licenses and financing necessary to develop Valley View Downs, unsecured creditors would be better off receiving their pro rata share of $50 million today than taking a risk on a speculative return on an equity interest some time in the future.

[2]  Net of the repayment of intercompany advances totaling not more than $290,000 that are entitled to administrative expense priority pursuant to prior orders of this Court.

[3]  For instance, the 2009 Debtors are now being asked to bear the burden of the 2010 Debtors' retention of Blackstone Advisory Partners L.P. as investment banker and financial advisor at a cost of $200,000 per month commencing September 2009 and, in addition to certain other fees, a success fee of $5 million - - even though the 2009 Debtors are not receiving services that would justify such expenses. *See* 2009 Debtors' Application for (i) Authority to Employ and Retain Blackstone Advisory Partners L.P. as Investment Banker and Financial Advisor for the Debtors Nunc Pro Tunc to March 6, 2010 and (ii) Waiver of Certain Requirements of Local Rule 2016-2. (D.I No. 168).

- 2 -

initial phase of Valley View Downs -- cash that they do not have and cannot borrow. Further, creditors of VVD LP would be better off receiving their pro rata share of the $50 million cash, rather than an equity interest in a highly speculative venture;

- The 2009 Debtors have not filed a single monthly operating report; and

- The 2009 Debtors and their management have breached their fiduciary duties to creditors by gambling with creditor recoveries for the benefit of the First Lien Lenders (defined below).

4.      These facts and circumstances lead to an inescapable conclusion; immediate liquidation will best serve the interests of all creditors of the 2009 Debtors.

5.      Rather than allowing this recovery opportunity to dissipate or be transferred for the benefit of the 2010 Debtors and the First Lien Lenders, this Court should enter an order converting these cases. Upon such conversion, the Chapter 7 trustee will withdraw the License Application, recover the $50 million from the L/C Issuer (as defined below), repay the intercompany loans, and then distribute the cash pro rata to unsecured creditors -- including the Second Lien Lenders. Preserving the "development opportunity" at Valley View Downs is simply not worth the cost; even assuming the Debtors had the financial means to develop the project (which they do not) -- Valley View Downs would not yield a recovery to the creditors of the 2009 Debtors justifying their $50 million investment. Therefore, it is most certainly in the best interests of the creditors of the 2009 Debtors to promptly convert these cases and distribute the cash.

6.      VVD LP has liabilities to the First Lien Lenders and the Second Lien Lenders in the aggregate amount, as of the Petition Date, of more than $570 million. VVD LP is also allegedly indebted to the Pennsylvania Real Estate Investment Trust for more than $29 million.[4]

---

[4]      Upon information and belief, this amount includes the $50 million License Application fee, but does not include any amounts necessary to obtain the license for and construct the "table gaming" portion of Valley View Downs. Just the licensing fees for table gaming operations commencing July 1, 2010 will be $24.5 million.

Movant respectfully submits that the greatest recoveries to be achieved by this substantial creditor body will be from withdrawal of the License Application and distribution ratably of the $50 million (after repayment of priority intercompany indebtedness approved by this Court). If this is not done promptly, creditors of VVD LP run the substantial risk that the $50 million will be dissipated through the continued incurrence of costs and expenses, and the pledge of the residual interest in the $50 million to support the 2010 Debtors' operations for the principal benefit of the First Lien Lenders (all to the detriment of unsecured creditors of VVD LP).

## Factual Background

7.       The 2009 Debtors' chapter 11 cases were commenced on October 28, 2009 (the "Petition Date"). The 2009 Debtors continue to manage these non-operating entities as debtors-in-possession. On March 19, 2010 the Office of the United States Trustee for the District of Delaware appointed a single committee to represent the interests of unsecured creditors of both the 2009 Debtors and the 2010 Debtors. (D.I. No. 186).

**Pre-Petition Credit Facilities and Events**
**Leading to the Bankruptcy Cases**

### *The First Lien Facility and the Second Lien Facility*

8.       Centaur, LLC, the indirect parent of the 2009 Debtors, is the borrower under (a) an Amended and Restated First Lien Revolving Credit and Term Loan Agreement, dated as of October 30, 2007 (the "Original First Lien Credit Agreement", and such facility, the "Original First Lien Facility"), and as amended and restated on September 17, 2008 (the "Amended First Lien Credit Agreement", and such facility, the "First Lien Facility"), with Credit Suisse, Cayman Islands Branch, as administrative agent (the "First Lien Agent") and certain lenders from time to time party thereto (the "First Lien Lenders"), and (b) an Amended and Restated Second Lien Term Loan Agreement, dated as of October 30, 2007 (the "Original Second Lien Credit

- 4 -

Agreement", and such facility, the "Original Second Lien Facility"), and as amended and restated on September 17, 2008 (the "Amended Second Lien Credit Agreement", and such facility, the "Second Lien Facility"), with Wells Fargo, as administrative agent (the "Second Lien Agent") and certain lenders from time to time party thereto (the "Second Lien Lenders"). The 2009 Debtors and certain other subsidiaries of Centaur, LLC are guarantors under both the First Lien Facility and the Second Lien Facility. As of the Petition Date, the 2009 Debtors owed approximately $382 million under the First Lien Facility and approximately $190 million under the Second Lien Facility.[5] *See* October 28, 2009 Declaration of Kurt E. Wilson in support of first day motions of the Non-Operating Pennsylvania Debtors ("Wilson Oct. Decl."), ¶ 9.

### *The Letter of Credit*

9.      Prior to the Petition Date, VVD LP had an application (a "License Application") pending with the Pennsylvania Gaming Control Board (the "PGCB") of the Commonwealth of Pennsylvania (the "Commonwealth") for approval of a category 1 gaming license (the "Gaming License"), which is required to operate the proposed casino.[6] As a condition to the License Application, VVD LP was required to post a $50 million letter of credit in favor of the Commonwealth, which may be drawn by the Commonwealth only when the License Application is approved.

10.      To satisfy the letter of credit requirement, VVD LP entered into a letter of credit and reimbursement agreement (the "Original L/C Agreement") with Credit Suisse, Cayman Islands Branch (the "Original L/C Issuer") pursuant to which the Original L/C Issuer issued a

---

[5]      The obligations under the First Lien Facility and the Second Lien Facility are secured by substantially all of the assets of Centaur, LLC and each of the guarantors, provided however, that the collateral does not include "Excluded Collateral" as such term is defined in the applicable security agreements). Among the items set forth in the definition of Excluded Collateral is the L/C Cash (as defined below).

[6]      As of the date hereof the Gaming License has not been approved.

RLF1 3552884v.1

letter of credit in the amount of $50 million (the "Original L/C") for the account of VVD LP to the Commonwealth, as beneficiary. The Original L/C was secured by $50 million of VVD LP's cash (the "L/C Cash") held in an account in the name of the Original L/C Issuer. The L/C Cash was otherwise unencumbered by any lien.

11.     The Original L/C was scheduled to expire on or about October 30, 2009. Prior to that date, the Original L/C Issuer notified VVD LP that it would not renew the Original L/C, thus putting the License Application in jeopardy. Upon information and belief, VVD LP was unable to find any letter of credit issuer, including the Original L/C Issuer, willing to provide a replacement letter of credit absent the protections available through an order of the Bankruptcy Court.

12.     As a result, the 2009 Debtors commenced these cases on the Petition Date, and sought immediate entry of an order authorizing VVD LP to enter into an amended and restated letter of credit reimbursement agreement (the "Amended L/C Agreement") with Credit Suisse, Cayman Islands Branch (the "Amended L/C Issuer") pursuant to which the Amended L/C Issuer would issue a letter of credit in the amount of $50 million (the "Amended L/C") for the account of VVD LP to the Commonwealth, as beneficiary, with an extended maturity date. *See* D.I. No. 3. According to the motion and related pleadings filed by VVD LP, the Amended L/C was to be secured by the L/C Cash and held in an account in the name of the Amended L/C Issuer. The L/C Cash in which VVD LP proposed to grant a lien to the Amended L/C Issuer was unencumbered at the time the lien was granted. *See* D.I. No. 3, n. 2 ("The L/C Cash is 'Excluded Collateral'"); *see also, Wilson Oct. Decl.* ¶ 7. By orders dated October 22, and November 23, 2009, this Court granted the relief sought by VVD LP. Upon information and belief, the Amended L/C was issued and remains outstanding as of the date hereof.

- 6 -

*The September 2008 Amendments, the $159.8 Million Prepayment by VVD LP to the First Lien Lenders and Contemplated Liquidation of the 2009 Debtors*

13.     At the time of closing of the Original First Lien Credit Agreement and the Original Second Lien Credit Agreement, among other transfers of funds, (a) $277,071,623.00 was funded into a bank account titled "Pennsylvania Term Loan Proceeds Account" and (b) $50 million was funded into a bank account titled "Pennsylvania Gaming LC Collateral Account". The proceeds of the Pennsylvania Term Loan Proceeds Account were to be used to fund the construction and development of Valley View Downs and the proceeds of the Pennsylvania Gaming LC Collateral Account were to be used to cash collateralize the Original L/C.[7]

14.     The size of the Original First Lien Facility was $590 million, and on October 30, 2007, a term loan of approximately $470 million was actually borrowed under the terms thereof and a $20 million revolving facility also became available. In addition, the Original First Lien Credit Agreement provided for a $100 million delayed-draw term loan tranche (the "Incremental Tranche"). On May 15, 2008, an additional term loan of $25 million was made available and borrowed under the terms of the Original First Lien Credit Agreement.

15.     On September 17, 2008, in connection with an out-of-court restructuring of the operations of Centaur, LLC, the 2009 Debtors and their affiliates, the $100 million Incremental Tranche was purportedly funded. However, in reality, no funding ever took place. Rather, the $100 million was deemed to have been drawn and deposited into the Pennsylvania Term Loan Proceeds Account, and then VVD LP was required to make a prepayment to the First Lien Lenders of all amounts on deposit in the Pennsylvania Term Loan Proceeds Account (which, after the deemed draw and deposit of the $100 million Incremental Tranche, totaled $259.8

---

[7]     On October 30, 2007, the First Lien Agent, the Second Lien Agent, VVD LP and Centaur, LP entered into a "Pennsylvania Disbursement Agreement" (the "Original Pennsylvania Disbursement Agreement") Sections 2 and 4 of which outlined the establishment of accounts and disbursement mechanisms for the construction of Valley View Downs.

- 7 -

million).[8] The practical effect was that neither the 2009 Debtors nor Centaur, LLC or any of its subsidiaries were able to access the funds under the Incremental Tranche, or the $159.8 million of funds that were already in the Pennsylvania Term Loan Proceeds Account (and earmarked for construction of Valley View Downs), all of which was paid over to the First Lien Lenders. *See Id.* In addition, the revolving commitment under the Original First Lien Facility was reduced to $15 million. *See Id.*[9] In connection therewith, on September 17, 2008, the First Lien Agent and Centaur, LLC entered into the Amended First Lien Credit Agreement and the First Lien Agent and the First Lien Lenders required VVD LP, Centaur, LLC, the Second Lien Agent and the Second Lien Lenders to amend and restate the Original Pennsylvania Disbursement Agreement (as amended and restated, the "Amended Pennsylvania Disbursement Agreement").

16.     In addition to the net $159.8 million pay down of the Original First Lien Facility out of the Pennsylvania Term Loan Proceeds Account, the First Lien Facility as amended and restated on September 17, 2008, expressly contemplated the sale or other liquidation of Valley View Downs and the termination and cancellation of the Original L/C.[10]

**Events Occurring Subsequent to the Commencement of These Cases**

17.     At the first day hearings conducted by this Court on October 30, 2009, counsel for

---

[8]     In addition, $6,212,611.10 was earmarked as "Wind Down Funds" for Valley View Downs.

[9]     This was achieved by a transfer of an additional $5.25 million from the Pennsylvania Term Loan Proceeds Account for repayment of the then outstanding Revolving Loans (as defined in the Original First Lien Credit Agreement). Accordingly, in addition to $7.7 million in consent fees and accrued and unpaid interest, $165.05 million was paid over to the First Lien Lenders and the Incremental Tranche was effectively cancelled.

[10]     Section 5.21 of the Amended First Lien Credit Agreement provides, as follows, in relevant part: "No later than ten (10) Business Days following the [execution of the Amended First Lien Credit Agreement, Centaur, LLC] shall engage an investment bank of recognized national standing acceptable to [Centaur, LLC and the required First Lien Lenders] to market and sell [Valley View Downs]." Upon information and belief, the 2009 Debtors retained Credit Suisse to market and sell Valley View Downs and, upon further information and belief, in the exercise of their business judgment, the 2009 Debtors rejected the offers that they received at that time. Due to logistical, geographical and economic reasons, the value of the Valley View Downs opportunity has only diminished since that time.

- 8 -

the 2009 Debtors advised the Court that the commencement of the 2009 Debtors' cases would likely be followed by the commencement of chapter 11 cases by Centaur, LLC and various other affiliates in order to implement a global capital restructuring that was allegedly under discussion among Centaur, LLC, the First Lien Lenders and the Second Lien Lenders. Shortly after that date, however, Centaur, LLC effectively terminated discussions with the Second Lien Lenders and engaged in negotiations exclusively with the First Lien Lenders. Upon information and belief, Centaur, LLC and the First Lien Lenders have excluded the Second Lien Lenders from negotiations on the errant belief that the enterprise value of the operating businesses is less than the outstanding amount owed to the First Lien Lenders, and that the First Lien Facility is the "fulcrum" security in the capital structure.

18. To date, the 2009 Debtors have not filed any operating reports; nor have they filed their schedules or statements of financial affairs. To fund their operations and to pay the administration expenses incurred by them (including in excess of $280,000 for ordinary course professionals in the period December 2009 through February 2010, *see* D.I. No. 170), the 2009 Debtors have received intercompany loans from their affiliate Centaur, LLC. The obligation to repay such loans to Centaur, LLC has been granted super-priority administrative expense status. *See* D.I. No. 60. Because no operating reports have been filed, it is impossible to tell the true costs associated with the chapter 11 cases or the maintenance of the Valley View Downs "opportunity."[11]

**The 2010 Debtors' Chapter 11 Cases;**
**Cash Collateral and Adequate Protection**

---

[11] One thing we do know is that it cost $450,000 for VVD LP to procure the Amended L/C, which had an initial termination date of January 29, 2010. VVD LP incurs additional costs for each extension of the Amended L/C it obtains.

RLF1 3552884v.1

19.     On March 6, 2010, Centaur, LLC along with several of its subsidiaries (other than the 2009 Debtors; the "2010 Debtors") filed chapter 11 cases with the Bankruptcy Court. In its Chapter 11 petition, Centaur, LLC lists assets of $584 million and liabilities of $681 million. *See* Centaur, LLC's Motion for Joint Administration ¶ 11, (D.I. No. 109).

20.     In conjunction with the commencement of their chapter 11 cases, the 2010 Debtors filed that certain Emergency Motion for (I) Entry of Interim and Final Orders (A) Authorizing the Use of Prepetition Secured Parties' Cash Collateral, (B) Granting Adequate Protection and Related Relief, and (C) Modifying the Automatic Stay, and (II) Interim and Final Hearings, dated March 8, 2010 (the "Cash Collateral Motion") (D.I. No. 121). The terms of the Cash Collateral Motion, the adequate protection package to be granted, and the related form of order (the "Proposed Cash Collateral Order") were negotiated by Centaur, LLC and the First Lien Lenders to the exclusion of the Second Lien Lenders.

21.     Upon reviewing the Proposed Cash Collateral Order, it became immediately apparent that the First Lien Lenders, in consideration for their agreement to allow the 2010 Debtors to use cash collateral to fund the operations and administrative costs of the 2010 Debtors,[12] were demanding *liens on the 2009 Debtors' reversionary interest in the L/C Cash, as well as superpriority and § 507(b) claims against the 2009 Debtors' estates.* In order to protect the interests of itself, the other Second Lien Lenders and other unsecured creditors of VVD LP, Goldman Sachs Specialty Lending Holdings, Inc., a significant Second Lien Lender, filed and prosecuted an objection to the Cash Collateral Motion. As a result, Judge Walrath limited the scope of the liens and claims that could be granted as adequate protection to $165,000, pending further order of the Court. Notwithstanding Judge Walrath's initial rulings, the intentions of both

---

[12]     The Budget submitted by the 2010 Debtors in connection with the Cash Collateral Motion showed no funds being provided to either of the 2009 Debtors during the relevant period.

- 10 -

the 2010 Debtors and the First Lien Lenders are clear -- to take for their own benefit (and to the detriment of all unsecured creditors of VVD LP) the interests of the 2009 Debtors in the $50 million of L/C Cash.

## Jurisdiction

22.     The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O).  The statutory predicate for the relief sought in this Motion is 11 U.S.C. § 1112(b).

## Legal Argument

23.     Section 1112(b) of the Bankruptcy Code provides that, upon motion of a party-in-interest, "absent unusual circumstances specifically identified by the court that establish that the requested conversion ... is not in the best interests of creditors and the estate, the court *shall*[13] convert a case under chapter 11 to a case under chapter 7 ... if the movant establishes cause."  11 U.S.C. § 1112(b)(1) (emphasis added); *see also*, *In re SCO Group, Inc.*, Case No. 07-11337, 2009 WL 2425755, at *5, n 7 (Bankr. D. Del. Aug. 5, 2009) ("[T]he Court must dismiss or convert Debtors' case if Movants' establish 'cause' which is defined in Section 1112(b)(4)."); *In re Products Int'l Co.*, 395 B.R. 101, 107 - 108 (Bankr. D. Ariz. 2008) (same); *Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) (noting the statutory language change from "permissive to mandatory" and finding cause exists to convert the debtor's case where the estate was diminishing rapidly at the expense of creditors as extensive administrative costs from professional fees were accumulating while the case lingered in chapter 11).

---

[13]     The 2005 amendments to § 1112(b) reduced the Bankruptcy Courts' discretion to convert or dismiss a chapter 11 case by changing "may" to "shall".

RLF1 3552884v.1

24.     Section 1112(b)(4) lists sixteen non-exclusive grounds constituting "cause" for conversion, including (i) "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation,"[14] and (ii) "unexcused failure to satisfy timely any filing or reporting requirement established by [the Bankruptcy Code] or by any rule applicable to a bankruptcy case."[15] 11 U.S.C. § 1112(b)(4). "[T]his list ... is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 n. 5 (2d. Cir. 1997) (*quoting* H.R. No. 95-595, 95th Cong., 1st Sess. at 406, reprinted in 1978 U.S.C.C.A.N. 5963, 6362); *see also*, *In re NuGelt, Inc.*, 142 B.R. 661, 665 (Bankr. D. Del. 1992) ("[T]he court is not limited to the statutory examples and cause may be determined from the facts and circumstances of the case.").

25.     "[I]f the Chapter 11 case cannot achieve a reorganization within the statutory requirements of the Code, then there is no point in expending estate assets on administrative expenses, or delaying creditors in the exercise of their non-bankruptcy law rights." *DCNC N.C. I, L.L.C. v. Wachovia Bank, N.A.*, Case No. 09-3775, 2009 U.S. Dist. LEXIS 93046, at *10 (E.D. Pa. Oct. 6, 2009) (concluding that bankruptcy court's dismissal of bankruptcy petitions about four months after filing date was not premature) (*citing*, *First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 572 (3rd Cir. 1991)). "[A] Chapter 11 case 'can be dismissed at any time. Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired.'" 2009 U.S. Dist. LEXIS 93046, at *11 (quoting *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994)).

---

[14]     Section 1112(b)(4)(A).

[15]     Section 1112(b)(4)(F).

- 12 -

26.     As shown below, cause exists to convert the 2009 Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

**Cause Exists Under Section 1112(b)(4)(A)**

27.     "Cause" under § 112(b)(4)(A) has two requirements: (i) "continuing loss to or diminution of the estate" and (ii) "absence of a reasonable likelihood of rehabilitation". The purpose of § 1112(b)(4)(A) is to "'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'" *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004) (*quoting, In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)). Both requirements of § 1112(b)(4)(A) are met here.

A.      The 2009 Debtors are suffering continuing losses and their estates are diminishing

28.     The 2009 Debtors have no operations, no business and no source of operating revenue. Their sole current source of funding is through intercompany borrowings from Centaur, LLC. The cash securing the License Application L/C is the only asset of VVD LP and land located in Pennsylvania is the only asset of Centaur PA. In order to fund their administration expenses, the 2009 Debtors continue to borrow from Centaur, LLC by granting to Centaur, LLC a superpriority administrative claim on account of amounts borrowed. Further, pursuant to the Interim Cash Collateral Order, the First Lien Lenders have now been granted a lien on the L/C Cash to the extent of $165,000 as 'adequate protection' for the use of their cash collateral by VVD LP. As a result, assets available for distribution to the 2009 Debtors' creditors have diminished and will continue to diminish without being replaced. Since no operating reports have been filed since the Petition Date and no other financial information has been provided, the actual extent of diminution and loss cannot be determined. However, it is

- 13 -

clear that the 2009 Debtors have continued to incur losses and suffer negative cash flows from and since the Petition Date, and will continue to do so into the future.

29.     "Continuing loss to or diminution of the estate" is shown by a debtor's continuing losses or negative cash flow position after the date of bankruptcy. *Loop Corp*, 379 F.3d at 515-516 ("[N]egative cash flow situation alone is sufficient to establish 'continuing loss to or diminution of the estate.'"); *In re Schriock Constr., Inc.*, 167 B.R. 569 at 575 (Bankr. D.N.D. 1994) (continuing loss to or diminution of the estate can be established by showing that debtor incurred continuing losses or maintained negative cash flow after entry of the order for relief); *In re Northeast Family Eyecare, P.C.*, Case No. 01-13983, 2002 WL 1836307, at *3 (Bankr. E.D. Pa. July 22, 2002) ("negative cash flow postpetition and an inability to pay current expenses satisfies the elements of § 1112(b)(1)."); 7 *Collier on Bankruptcy* ¶ 1112.04[6][a][i] (16th ed.) ("if the estate has sustained a substantial loss following the commencement of the case, or the debtor is operating with a sustained negative cash flow or diminution in asset value after the commencement of the case, these facts are sufficient to justify a finding of 'substantial or continuing loss to ... the estate.'")

30.     In addition to having negative cash flows and suffering continuing losses, the 2009 Debtors are hopelessly insolvent, have no operations or businesses, are proposing to be saddled with all of the diminution in the collateral of the First Lien Lenders caused by the 2010 Debtors' use of cash collateral (including diminution resulting from professional fees) and require not less than $176 million (which the 2009 Debtors do not have and have no prospect of obtaining) to construct the non-table gaming phase of Valley View Downs -- making the value of this "development opportunity" wholly speculative.[16] "All that need be found is that the estate is

---

[16]     Ironically, the 2009 Debtors had the funding they needed to construct the initial phase of Valley View Downs through a combination of the funds initially funded into the Pennsylvania Term Loan Proceeds Account and

- 14 -

suffering some diminution in value." *In re Citi-Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) (finding cause where administrative expenses, including real estate taxes, restoration expenses, and cost of hiring security guard, were accruing while construction project remained idle). Accordingly, the first requirement of § 1112(b)(4)(A) is satisfied.

B.     The 2009 Debtors cannot rehabilitate

31.     The second prong of § 1112(b)(4)(A) requires the "absence of a reasonable likelihood of rehabilitation." Rehabilitation means something different from the term reorganization in chapter 11. *Northeast Family Eyecare*, 2002 WL 1836307, at *3. In this context, rehabilitation means to put back in good condition and re-establish on a sound basis. *Id.*; *In re Lizeric Realty Corp.*, 188 B.R. at 503; *see also In re Kanterman*, 88 B.R. 26, 29 (Bankr. S.D.N.Y. 1988). "It signifies that the debtor will be reestablished on a secure financial basis, which implies establishing a cash flow from which its current obligations can be met." *In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003); *see also In re D&F Meat Corp.*, 68 B.R. 39, 41 (Bankr. S.D.N.Y. 1986) (no "rehabilitation" existed when post-petition fire destroyed estate assets; only fire insurance claim proceeds to be distributed to creditors).

32.     Here, the 2009 Debtors lack the financial wherewithal to meet their current obligations. Indeed, the 2009 Debtors have admitted that they lack funds sufficient to meet even the most basic obligations of their chapter 11 cases; for example they need to borrow funds from Centaur, LLC to pay their chapter 11 and ordinary course professionals, the costs and expenses of maintaining the Amended L/C (including extension fees), the real estate taxes for the land owned by Centaur PA, and all other administrative claims. Several months after the Petition

---

the $100 million Incremental Tranche. However, at the time the Amended First Lien Credit Facility was executed the First Lien Lenders wanted no part of the exposure related to the construction of Valley View Downs. As a result, the First Lien Lenders insisted that the funds in $159.8 million on deposit in the Pennsylvania Term Loan Proceeds Account be paid over to them, the $100 million Incremental Tranche effectively terminated, and Centaur, LLC seek a buyer for the Valley View Downs project.

RLF1 3552884v.1

Date, no disclosure statement or plan is in sight, there are no operations and administrative expenses and professional fees continue to erode the sole source of creditor recoveries.

33.    In addition, no business plan has been presented showing how the 2009 Debtors intend to construct their casino and gaming operation and no information on a potential source of financing for the construction of such operation has been presented. A debtor must have a viable business in place in order to have any potential for rehabilitation. *In re Ironsides, Incorporated*, 34 B.R. 337, 339 (Bankr. W.D. Ky. 1983) (if there is no viable business liquidation should occur).

34.    Clearly, the 2009 Debtors cannot be rehabilitated as they continue to suffer financially, have negative cash flows and do not and cannot generate any revenue absent a massive cash infusion into a highly speculative venture. In addition, no information on availability of capital to actually construct and operate Valley View Downs has been presented. Accordingly, the 2009 Debtors have no reasonable likelihood of rehabilitation and the second requirement of § 1112(b)(4)(A) has been satisfied.

35.    Therefore, cause has been shown under § 1112(b)(4)(A) mandating that these cases be converted to cases under chapter 7 of the Bankruptcy Code.

**Cause under Section 1112(b)(4)(F)**

36.    The 2009 Debtors have failed to file a single operating report and such failure constitutes cause to convert their chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1112(b)(4)(F); *see also, In re All Denominational New Church*, 268 B.R. 536, 538 (8th Cir. BAP 2001) ("[f]ailure to file monthly operating reports, whether based on inability to do so or otherwise, undermines the Chapter 11 process and constitutes cause for dismissal or conversion of the Chapter 11 proceeding."); *In re Robino*, 243 B.R. 472, 485-86 (Bankr. N.D. Ala. 1999) (same); *In re Berryhill*, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991)

- 16 -

(same); *In re Chesmid Park Corp.*, 45 B.R 153, 159 (Bankr. E.D. Va. 1984) (same); *In re Modern Office Supply, Inc.*, 28 B.R. 943, 945 (Bankr. W.D. Okla. 1983) (same).

37.     According to one court, "[t]imely and accurate financial disclosure is the life blood of the Chapter 11 process. Monthly operating reports are much more than busy work imposed upon a Chapter 11 debtor for no reason other than to require it to do something. They are the means by which creditors can monitor a debtor's post-petition operations. As such, their filing is very high on the list of fiduciary obligations imposed upon a debtor in possession. Thus, the failure to file operating reports in itself constitutes 'cause' for dismissal." *In re Berryhill*, 127 B.R. at 433 (internal citations omitted).

### The 2009 Debtors cannot confirm a feasible plan

38.     Although "[f]ollowing the 2005 BAPCPA amendments, Section 1112(b) no longer expressly lists 'inability to effectuate a plan' as an example of cause," …it "remains a viable basis for dismissal because the listed examples of cause are not exhaustive." *DCNC N.C. I, L.L.C. v. Wachovia Bank, N.A.*, 2009 U.S. Dist. LEXIS 93046, at *14.

39.     Here, there is no reasonable likelihood that a plan can be confirmed. *See In re Woodbrook Assocs.*, 19 F.3d. at 317 ("The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless."); *In re All Denominational New Church*, 268 B.R. at 538 ("cause" exists under § 1112(b)(2) when "it is unreasonable to expect that a plan can be confirmed in the case"); *In re Moore Constr., Inc.,* 206 B.R. 436, 438 (Bankr. N.D. Tex. 1997) (cause to convert when debtor's financial statements showed no ability to pay estate's administrative claims in full on effective date of proposed plan of reorganization, as required under Bankruptcy Code § 507(a)(1)). As the Supreme Court has said, "however honest in its efforts the debtor may be, and however sincere its motives, [the court] is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *First Jersey Nat'l Bank v.*

- 17 -

*Brown*, 951 F.2d at 572 (*quoting, Tennessee Publ'g Co. v. American Nat'l Bank*, 299 U.S. 18, 22 (1936)). "[T]here must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" 951 F.2d at 572 (*quoting, United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988)).

40.     The 2009 Debtors' chapter 11 cases have been pending for almost five months. In that time, the 2009 Debtors have filed no plan and have failed even to devise a feasible exit strategy. More importantly, the 2009 Debtors cannot confirm a feasible plan because they have substantial debt and no operations or businesses, and lack the funding necessary to construct the initial phase of Valley View Downs. Further, the 2009 Debtors acceded to the demands of the First Lien Lenders and agreed in September 2008 that they should not proceed with construction of Valley View Downs, but rather should sell or otherwise dispose the assets and recover the L/C Cash. By this Motion, the Movant seeks to simply implement the decisions and agreements reached by the 2009 Debtors in 2008. As a result, conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code is appropriate.

**The 2009 Debtors have breached their fiduciary duties**

41.     A debtor-in-possession is a fiduciary to the estate, creditors and the Court. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[I]f a debtor remains in possession. . .the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession."); *In re United Healthcare System, Inc.*, 200 F.3d 170, 177 n. 9 (3d Cir. 1999) (citing *Commodity Futures Trading Comm'n* for proposition that debtor-in-possession is fiduciary for its estate and its creditors); *In re Shop N' Go P'ship*, 261 B.R. 810, 814 (Bankr. M.D. Pa. 2001) (same). Accordingly, a debtor-in-possession has a duty to "exercise that measure of care and diligence that an ordinary prudent person would exercise under similar circumstances." *See In re Rigden*,

- 18 -

795 F.2d 727, 730 (9th Cir. 1986) (by analogy, trustee must exercise care and diligence of an ordinary prudent person). A debtor-in-possession is also bound by a duty of loyalty and has a fiduciary obligation to conserve the estate's assets and maximize distributions to creditors. *See In re Coram Healthcare Corp.*, 271 B.R. 228, 235 (Bankr. D. Del. 2001) ("A debtor-in-possession is bound by a duty of loyalty that includes an obligation to refrain from self dealing, to avoid conflicts of interests and the appearance of impropriety."). A debtor-in-possession's fiduciary duty to preserve the value of an estate includes the duty to "cease operations where continued operations would deplete the estate with no reasonable prospect of rehabilitation." *State of Ill., Dep't of Revenue v. Schechter*, 195 B.R. 380, 384 (N.D. Ill. 1996); *see also United States ex rel. Harrison v. Estate of Deutscher*, 115 B.R. 592, 597 (M.D. Tenn. 1990) (same).

42.     For the reasons discussed above, here the prudent course of action is to stop the bleeding, conserve assets for the benefit of creditors, and convert the cases to chapter 7 rather than maintain the façade of a development opportunity and be forced to subsidize the costs and expenses of the 2010 Debtors' operations and chapter 11 cases. Instead, the 2009 Debtors have chosen to not only drift along in chapter 11 with no prospect for reorganization, but to also sacrifice the asset value that would be available for payment of their creditors' claims to support the operational and administrative costs *of the 2010 Debtors* by agreeing to grant the First Lien Lenders adequate protection liens on the 2009 Debtors' reversionary interests in the L/C Cash.

43.     In addition, as demonstrated above, there is an actual conflict of interest between the interests of the 2009 Debtors, on the one hand, and the 2010 Debtors, on the other hand. Yet, the 2009 Debtors seek to remain in chapter 11 to support the 2010 Debtors' chapter 11 cases. One apparent reason for the 2009 Debtors' commitment to the chapter 11 process is the simple fact that the First Lien Lenders do not have a lien on the $50 million used to collateralize the

- 19 -

Amended L/C and the 2009 Debtors -- in conjunction with the 2010 Debtors and the First Lien Lenders -- are trying to devise ways to access this cash for the benefit of the 2010 Debtors and the First Lien Lenders, and to the detriment of unsecured creditors of VVD LP. While the 2009 Debtors and 2010 Debtors continue to develop their plot, the assets of the 2009 Debtors' available for distribution continue to dissipate.

44.     The Bankruptcy Court should not sanction this conduct and should convert the 2009 Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

**Conversion is in the best interests of creditors**

45.     "A motion filed under § 1112(b) necessitates a two-step analysis: (1) to determine if 'cause' exists to either dismiss the Chapter 11 case or convert the Chapter 11 case to a Chapter 7 [case] and (2) to determine which option, dismissal or conversion, is in the 'best interest of creditors and the estate.'" *In re Camden Ordnance Mfg. Co. of Ark., Inc.*, 245 B.R. 794, 798 (E.D. Pa. 2000) (*citing In re Superior Siding & Window*, 14 F.3d 240, 242 (4th Cir. 1994)).

46.     Here, under the circumstances described above, conversion of the 2009 Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code would best serve the estates and their creditors. Conversion, unlike dismissal, will provide a swift and efficient means for the determination of claims against the 2009 Debtors and a means for prompt and efficient distribution of the $50 million in cash.

RLF1 3552884v.1

**WHEREFORE**, the Movant requests that the Bankruptcy Court (i) enter an order substantially in the form annexed hereto as **Exhibit A** converting the 2009 Debtors' chapter 11 cases to cases under chapter 7 and (ii) grant such other or further relief as is necessary and just.

Dated:  March 25, 2010
       Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.
John H. Knight (No. 3848)
Chun I. Jang (No. 4790)
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

SCHULTE ROTH & ZABEL LLP
Adam C. Harris
(A Member of the Firm)
Sanjay Thapar
919 Third Avenue
New York, New York 10022
Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955

*Attorneys for* Wells Fargo Bank, N.A., in its capacity as Administrative Agent and Collateral Agent